Filed 6/28/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S099549 |
| v. | ) | |
| | ) | |
| MICHAEL AUGUSTINE LOPEZ, | ) | |
| | ) | Alameda County |
| Defendant and Appellant. | ) | Super. Ct. No. H28492A |
| _____ | ) | |

A jury convicted defendant Michael Augustine Lopez of the first degree murder of Ashley D., his girlfriend's 21-month-old granddaughter (Pen. Code, § 187, subd. (a); further undesignated statutory references are to the Penal Code), assault resulting in the death of a child under eight years old (§ 273ab), and committing lewd and lascivious conduct on a child under the age of 14 (§ 288, subd. (b)(1)). The jury found true the special circumstance allegation that the murder involved torture (§ 190.2, subd. (a)(18)) and the enhancement that he inflicted great bodily injury while committing lewd and lascivious conduct (§ 12022.8, subd. (b)). The jury also found true that Lopez suffered five prior prison terms. (§ 667.5, subd. (b).) The jury returned a verdict of death. The trial court sentenced Lopez to death on the murder count and stayed Lopez's remaining sentence.

This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

On June 4, 1999, Sandra Harris, Lopez's live-in girlfriend, brought Ashley to the hospital.  Ashley was unconscious and badly bruised all over her body; she had suffered extensive trauma to her genitalia and a serious head injury.  Ashley never regained consciousness and died from her injuries later that day.

Lopez was tried jointly with Harris, who was found guilty of first degree murder and willful infliction of cruelty on a child (§ 237a, subd. (a)).  The jury further found true that she willfully caused and permitted a child to be injured, resulting in unjustifiable pain and death (§ 12022.95).  The trial court sentenced Harris to 25 years to life with the possibility of parole.  Harris is not a party in this appeal.

### A.  Guilt Phase

#### 1.  Prosecution Case

##### a.  Family Overview

Lopez and Harris lived together with their three-and-a-half-year-old son, M.L., in Hayward.  Harris had two daughters from prior relationships:  24-year-old Nicole and 17-year-old Laurie.  Nicole had lost custody of her three children, including Ashley and five-year-old S.B., because of a drug problem.  S.B. lived with Lopez and Harris, while Ashley lived with Harris's stepfather, Jesse Lopez (no relation to defendant Lopez).  Laurie also lived with Jesse, although she visited her mother almost every day to smoke methamphetamine together.  Lopez also regularly smoked methamphetamine.

2

Lopez worked at a window manufacturing company. His usual shift started at 6:00 a.m. and concluded at 2:30 p.m., with a 30-minute lunch break at 10:00 a.m. Lopez often went home on his lunch break.

Harris worked as the co-manager of her apartment complex in an office adjacent to the apartment she shared with Lopez. She typically worked from 3:00 p.m., after Lopez returned home from his job, until around 8:00 p.m.

### b. Ashley's Stay with Laurie

On May 26, 1999, Jesse developed a medical condition and needed to be hospitalized for a few days. He called Harris, asking for Laurie to pick up Ashley and take care of her for a few days. Jesse gave Laurie a check for $400 to cover Ashley's expenses. Because Laurie had plans for the upcoming holiday weekend, Laurie asked her mother and Lopez to watch Ashley instead. But they refused, saying they could not afford it.

Laurie watched Ashley from Wednesday, May 26, through Saturday, May 29. Ashley maintained her regular sleep schedule of sleeping through the night and waking up at 7:30 or 8:00 a.m. During the three nights that Ashley stayed with Laurie, Ashley never woke up in the middle of the night needing her diaper changed.

Laurie's friend Kelly R. helped her take care of Ashley on May 28 and May 29. Kelly bathed Ashley and changed her diaper, and did not notice any injuries or diaper rash at that time.

### c. Ashley's Stay with Lopez and Harris

Laurie brought Ashley to Lopez and Harris's apartment on May 29, again asking them to take care of the baby. They refused, saying they could not afford to take care of Ashley. Lopez eventually told Laurie that they would take care of Ashley if Laurie gave them the money that Jesse had left her. Laurie asked Jesse

3

if she could give Lopez and Harris the remaining money in exchange for watching Ashley, but he told her to wait until he was discharged from the hospital. Nonetheless, Lopez and Harris accepted the care and custody of Ashley later that day.

The following morning, on Sunday, May 30, Harris visited her daughter Nicole in jail. While Harris was away, Ashley played outdoors with other children in the apartment complex. A neighbor testified that she saw Ashley playing outdoors on and off for approximately three hours, during which time Ashley appeared to be enjoying herself. She was walking normally and did not appear to be injured. When Harris returned at approximately 2:00 p.m., Ashley was asleep. When Ashley awoke, Harris noticed that she was walking strangely and in a bowlegged fashion. Harris thought Ashley probably had a diaper rash because she had a history of having severe diaper rashes that caused blistering. Harris took Ashley's diaper off and noticed that instead of a diaper rash, the baby "was bruised down there." Sometime later that afternoon, Lopez visited Laurie at Jesse's house to pick up the money remaining for Ashley's care, approximately $200.

The next day, on Monday, May 31, Harris briefly visited Laurie and her boyfriend, David S., at Jesse's house. Harris told David that Ashley suffered bruising from riding a bicycle the previous day.

The following day, on Tuesday, June 1, the apartment complex manager Luz Arzate arrived at the office next door to Harris and Lopez's apartment at 9:00 a.m. Arzate heard Ashley crying on and off all morning in what she described as a painful cry. When she asked Harris about the cries, Harris responded that Ashley was vomiting and had a fever. Sometime that day, Harris told Laurie that Ashley had injured herself on a bicycle. When Laurie asked Harris if she planned to take Ashley to the hospital, Harris said no because she did not have medical insurance.

4

Later that afternoon, Harris went to work next door. Harris heard noises coming from her apartment at approximately 4:00 p.m. and went home to investigate. Harris walked toward the bedroom shared by S.B., M.L., and Ashley. She observed Lopez standing in the doorway; S.B., Ashley, and M.L. inside the bedroom; and two neighbor children, Rouslen and Andy, also in the bedroom. Harris saw Ashley lying on the floor, crying, with Rouslen standing over her holding a stick. Harris heard Lopez say, "Why is this baby on the floor with no diaper on and you poking her and hitting her with the stick?" Lopez told Rouslen and Andy, "Get the hell out of here."

A few hours later, Harris left their apartment to lock the complex's laundry room door. She heard a commotion coming from inside her apartment. Harris walked into her bedroom and saw Lopez holding Ashley. Ashley had diarrhea and was vomiting at the same time. Lopez was trying to change her diaper, and S.B. was gathering toilet paper, trying to help him clean up. Harris believed that Ashley was getting the flu.

On Wednesday, June 2, Arzate arrived at her office at 9:00 a.m. She again heard Ashley crying and believed the crying had intensified from the previous day. When she asked Harris if Ashley was all right, Harris responded that she believed Ashley was sick. Harris told Arzate that Ashley bore more bruises every day. Harris further explained that she thought M.L. was hitting Ashley.

When Laurie visited Harris later that morning, Harris showed Laurie Ashley's bruised genital area for the first time. Laurie testified that Ashley "was just bruised badly, very badly. It was red and purple and blue. . . . It was awful." Laurie also saw a little bit of blood in Ashley's diaper. Laurie asked her mother "if there were any perverts that lived around there." When she told Harris to take Ashley to the doctor, Harris replied that she could not afford to take her.

Lopez returned home from work at some point while Laurie was visiting her mother. Ashley suddenly became very clingy toward Laurie and screamed when Laurie tried to separate herself from Ashley.

Later that evening, Lopez and Harris left the house for one to two hours. They asked their teenage neighbor, Leonora M., to babysit S.B. and Ashley while they were out. Leonora noticed bruises on Ashley's face. She testified that Ashley appeared scared, tired, confused, and dazed.

On Thursday, June 3, Arzate returned to work at 9:00 a.m. She heard Ashley crying again and described it as "a weak and a help cry." Around the same time, Laurie visited her mother while Lopez was at work. Laurie believed the bruising on Ashley's genitals remained the same from the previous day, but she noticed new bruising on the side of Ashley's head. Laurie left her mother's apartment at noon, at which time Harris put the children down for a nap. Shortly after, Harris heard Ashley crying. Harris walked into the children's bedroom and saw S.B. sitting on top of Ashley, holding Ashley's ears and pounding her head into the pillow. When Harris walked in, S.B. exclaimed that she did not like Ashley and wanted her to go home.

Later that afternoon, Leonora returned to babysit S.B. and Ashley for a couple of hours while Harris worked next door. Leonora noticed more bruising on Ashley's face. When Harris returned home from work at approximately 5:30 p.m., Ashley started vomiting again. At some point, Harris changed Ashley's diaper and showed Leonora Ashley's genital bruising. Leonora told Harris that the bruising did not look normal and that she needed to take Ashley to the hospital. Harris responded that she did not want to take Ashley to the hospital because she was afraid people would think she had hurt Ashley and because she did not have medical insurance. Leonora asked Harris how Ashley obtained the bruises on her face. Harris responded that Ashley had rolled off the bed and hit the side of her

6

face on the dresser. Leonora testified that she thought it was "impossible" for a baby to roll over far enough on the bed to fall off. Leonora further testified that Ashley appeared tired and confused, and remained inactive while Leonora was at the apartment.

Harris had trouble falling asleep that night and stayed awake until 4:00 a.m. the following morning, June 4. She testified at trial that she woke up at 5:30 a.m. to find Lopez still asleep; she woke him up and sent him off to work. However, Harris told detectives on June 4 that she woke up to Ashley crying at 4:45 a.m. while Lopez was changing her diaper. Harris told the detective this was unusual because Ashley never needed her diaper changed in the middle of the night, and she questioned why Lopez had done it every night while Ashley was with them. When the prosecutor questioned her on cross-examination, she claimed this incident had happened on Thursday, June 3 and the detective wrote down the wrong date.

Laurie arrived at her mother's apartment around 9:00 a.m. She walked into the children's bedroom to check on Ashley after she arrived; it appeared Ashley was still asleep. Shortly after Lopez arrived home on his lunch break around 10:30 a.m., Harris walked into the bedroom to check on Ashley. Harris walked toward Ashley and realized the baby was not responding. She picked up Ashley, whose body was limp. At that point, Laurie walked into the bedroom and realized that Ashley was comatose. Lopez walked in and took Ashley away from Harris, who became hysterical. Lopez began shaking Ashley and saying she was okay. Laurie exclaimed that they needed to take Ashley to the hospital. Lopez told Harris that she could not take the baby to the hospital because "they will think you beat the shit out of this baby. They will arrest you, Sandra." Lopez lifted Ashley's eyelids and said, "Look, she's responding," although she remained

7

unresponsive. Laurie grabbed her car keys while Harris took Ashley back from Lopez. Laurie drove Harris and Ashley to the hospital.

### d. The Hospital

Dr. Bernice Rodrigues was the emergency medicine physician at St. Rose Hospital. When Ashley came into Dr. Rodrigues's care on June 4, she was unconscious, badly bruised all over her body, had suffered a very serious head injury and extensive trauma to the genitalia, and was "essentially close to dying." Ashley was unresponsive to verbal or painful stimuli. The emergency room nurse believed Ashley showed signs of abuse and filed a report with the police.

At some point that day, Ashley was transported to Children's Hospital Oakland (CHO). Dr. James Crawford, the medical director of CHO's Center for Child Protection, examined Ashley that evening. He testified that she "had bruises on virtually any part of the body you looked at." Dr. Crawford opined that many of the bruises were consistent with being punched by an adult fist. The bruises on Ashley's torso were consistent with an adult grabbing her and squeezing her chest, leaving fingerprint impressions. In addition, Ashley's right ear had suffered a tear about the width of a thumbnail, consistent with someone pulling or squeezing her ear.

Dr. Crawford described the bruising and swelling to Ashley's genitalia as "the result of some very massive blunt force trauma"; he did not believe the injuries had resulted from a straddle injury on a bicycle. Dr. Crawford explained that in addition to bruising, Ashley's genitalia "was ripped and torn" from her vaginal opening to her anus. Dr. Crawford noted that whatever had caused the trauma was not forced into the vagina itself, but rather was forced into the genitalia and then tore the tissue. He acknowledged that an erect male penis could have caused the tear if forced into Ashley's genitalia. Dr. Crawford opined that

8

such a tear would "absolutely" cause bleeding and that it would be "quite painful for an infant, or toddler, or an adult, to have this much tissue torn." He believed that the injuries had occurred within three to seven days before his examination. He explained that a child with the described injuries "would have walked funny" and "in a manner to try to minimize the discomfort to herself."

Dr. Crawford also testified that Ashley's brain was "very abnormal" in appearance and "very swollen." In addition to blood around her brain, Ashley had suffered a large skull fracture to the back right side of her brain, indicating "very significant" blunt trauma to the head. He believed the injury had occurred sometime Friday morning. He did not believe another child could have wielded enough force to cause Ashley's head injury.

During the evening of June 4, Nicole made the decision to remove Ashley from life support, and she died. Dr. Crawford testified that the pressure inside Ashley's skull from the brain swelling had prevented blood from flowing to her brain in the hours before she was removed from life support.

### e. Subsequent Events and Investigation

Lopez returned to work on June 4 after his lunch break ended, bringing S.B. and M.L. with him. Shortly after returning, Lopez indicated that he had a family emergency and left work. He did not return. Sometime later that afternoon, Lopez brought M.L. to his sister's house in Modesto. Lopez asked his sister for directions to a local freeway and left shortly after.

On June 5, Leonora found Lopez's pajamas in Harris's bathroom. Leonora noticed a spot of blood on the pajama shirt and alerted Harris. Harris called the police, who arrived the following day to retrieve the shirt. Forensic testing "strongly suggest[ed]" that Ashley was the source of the blood stain on Lopez's shirt.

9

A few days later, Lopez drove with M.L. to visit his friend and former brother-in-law Isaac Corrales in Monte Rio. Lopez and his son stayed with Corrales for three or four days. Lopez told Corrales and his girlfriend, Kelley Matheson, that he and Harris "were having troubles" and sent Corrales and Matheson to pick up his final paycheck. Lopez also told his friends that M.L. had hit Ashley on the head with a toy and that Ashley had hurt herself on a bicycle. He did not tell them where he was going next when he left a few days later.

On June 29, Lopez returned to his apartment complex with M.L. during the middle of the night. A neighbor heard him banging on a door and called the police. Officers arrived at the scene and arrested Lopez.

Sometime after Ashley's death, S.B. was removed from Harris's care and placed in emergency foster care. Child Protective Services (CPS) permitted S.B. to attend Ashley's funeral, at which time she informed Laurie that she had seen Lopez thrusting his torso on Ashley. In mid-July, S.B.'s great-aunt Cindy Jardin was awarded temporary custody of S.B. While in Jardin's care, S.B. told her aunt that she had seen Lopez punch Ashley in the chest, stomach, and genital area. S.B. told her next foster mother that Lopez had previously broken her leg. When her foster mother asked S.B. if Lopez had ever touched "his private part to [her] private part," S.B. said that "he only did that to Ashley." M.L., who was also placed into foster care, told his foster mother that Ashley was in heaven because Lopez "cracked her head on the hard floor."

### 2. Defense Case

Lopez did not testify. The defense recalled Dr. Thomas Rogers, who performed Ashley's autopsy. Dr. Rogers testified that he could not opine on the cause of Ashley's bruises. The defense called a neighbor who testified that she saw Lopez interact with the children and never saw him hit them. She further

testified that Rouslen was a tough kid who made suggestive remarks to other children. The defense relied on testimony from Harris to imply that M.L. or Rouslen, or both, could have caused Ashley's injuries. Lopez also presented evidence through a detective's testimony that Harris hit her children and may have contributed to Ashley's injuries. During closing argument, Lopez's counsel argued that he was too high on methamphetamine to form the required intent to commit murder. Counsel further argued that both Harris and Laurie had a motive and the opportunity to inflict injuries upon Ashley, and suggested they may have acted in concert.

## B. Penalty Phase

### 1. Case in Aggravation

The prosecutor presented evidence of six instances of prior acts of violence, five of which resulted in arrest and prosecution. These five priors were: (1) a 1992 shoplifting incident during which Lopez assaulted the store clerk and became violent with police, (2) a 1986 shoplifting incident during which Lopez attacked the arresting officer and threatened another officer at the jail, (3) a 1991 knife assault on his estranged wife and her 15-year-old son, (4) a 1994 assault on his ex-wife, and (5) a 1990 assault on an officer following an arrest for driving under the influence. A neighbor testified about the one prior bad act that did not result in arrest and prosecution, which involved Lopez hitting M.L. with a stick "like a piñata."

The prosecutor also presented victim impact testimony from Jesse Lopez, Laurie, and Ashley's paternal great-grandmother. The family members described Ashley's kind and good-natured spirit, how difficult her funeral was, and how her death affected them as individuals.

11

### 2. Case in Mitigation

In his case in mitigation, Lopez introduced evidence regarding his low mental capacities and good nature. Clinical neuropsychologist Nell Riley, Ph.D., administered several tests to Lopez and interviewed him, his mother, and his sister. Her testing revealed that Lopez had a very low IQ score typically associated with people who are intellectually disabled, but she opined that Lopez was not actually intellectually disabled. Riley explained that for a person to be considered intellectually disabled, he or she must have a low IQ but also be unable to function well in the community without assistance or supervision. Riley noted that Lopez held a job, rented an apartment, drove a car, and was generally able to "do what pretty much normal people do."

Two of Lopez's coworkers, a neighbor, and several family members also testified on his behalf. The coworkers explained that Lopez occasionally brought his children to work to celebrate coworkers' birthdays and that he would bring people flowers or cake on special occasions. The neighbor spoke of Lopez's church attendance. Lopez's mother testified that Lopez was in a car accident when he was younger, which left him in a coma for four days. She said after he woke up from the coma, he was "different" and "not as happy as he used to be." Lopez's father spoke about Lopez's upbringing. Both of his parents expressed their love for their son and asked the jury to spare his life. Additional family members testified about Lopez's care for the children and other family members.

### 3. Rebuttal Evidence

In rebuttal, the prosecutor presented evidence that Lopez had committed welfare fraud by failing to report income for seven months while he received welfare grants. Lopez was not arrested because he cooperated and agreed to pay the money back.

## II. GUILT PHASE ISSUES

### A. Admission of Testimony by Child Witnesses

S.B. was five years old at the time of Ashley's death; she was six and a half years old when she testified at trial. M.L. was three and a half years old when Ashley died; he was one month shy of his fifth birthday when he testified at trial.

S.B. testified that she had seen Lopez punch Ashley "in her privates" and thrust himself against Ashley's body. S.B. indicated that the night before Ashley died, she saw Lopez hold Ashley above his head and throw her onto the ground. S.B. hid under the covers and did not see where Lopez went after he threw Ashley. She heard Ashley crying before Lopez picked her up, but Ashley did not cry again after he threw her down.

M.L. testified that on the night before Ashley died, his father walked into their bedroom, picked up Ashley, and threw her down on the floor. M.L. explained that Lopez "cracked her head." On cross-examination, M.L. testified that other people told him to say that his dad hurt Ashley by picking her up and throwing her down.

#### 1. Evidence Code Section 702

Lopez filed pretrial motions challenging the admission of S.B.'s testimony, arguing it violated Evidence Code section 702. Lopez argued that her statements were based on "brainwashing" by the adults caring for the children, not personal knowledge as required under Evidence Code section 702.

The Evidence Code provides that "the testimony of a witness [at trial] concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).) "[T]he capacity to perceive and recollect particular events is subsumed within the issue of personal knowledge . . . ." (*People v. Anderson* (2001) 25 Cal.4th 543, 573 (*Anderson*).) " '[T]he

13

court may exclude the testimony of a witness for lack of personal knowledge *only if no jury could reasonably find* that he has such knowledge.' " (*Ibid.*) "[I]f there is evidence that the witness has those capacities, the determination whether he in fact perceived and does recollect is left to the trier of fact. [Citation.]" (*Id.* at pp. 573–574, italics omitted; see *id.* at p. 574 ["A witness challenged for lack of personal knowledge must nonetheless be allowed to testify if there is evidence from which a rational trier of fact could find that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible." (italics omitted)].) We review a trial court's determination to admit testimony for abuse of discretion. (*People v. Cortez* (2016) 63 Cal.4th 101, 124.)

At the hearing on Lopez's motion to exclude S.B.'s testimony, the trial court concluded that S.B. was competent to testify based on the magistrate's finding from the preliminary hearing that she was qualified under Evidence Code section 701. (See Evid. Code, § 701, subd. (a) [a person is disqualified to be a witness if she is incapable of expressing herself and incapable of understanding the duty to tell the truth].) The trial court expressed concern about "put[ting] this child through another preliminary proceeding outside the presence of the jury." The trial court stated, "We have the judge's findings, factual findings. He listened to her. And unless counsel can furnish me with some authority that indicates I'm required to conduct my own hearing as to her competency, I'm not going to do so." The trial court denied Lopez's motion to exclude the testimony and noted that Lopez's suggestion of brainwashing and potential inconsistent statements would be "fair game" during cross-examination.

Lopez indicated at the hearing on S.B.'s competency that he would make a similar motion to exclude M.L.'s testimony if the prosecutor decided to call him to testify. Lopez subsequently filed the motion, and the trial court held a hearing

14

before M.L. was to take the stand. The court asked M.L. several questions regarding his ability to distinguish between the truth and a lie, and the consequences of telling a lie, and ultimately permitted M.L. to testify.

The core of Lopez's argument is that the children were not qualified to testify because they lacked personal knowledge as evidenced by their inconsistent testimony. "Inconsistencies in testimony and a failure to remember aspects of the subject of the testimony, however, do not disqualify a witness. [Citation.] They present questions of credibility for resolution by the trier of fact." (*People v. Mincey* (1992) 2 Cal.4th 408, 444.)

The record reveals no abuse of discretion because sufficient evidence supported a finding of personal knowledge. Several witnesses testified that S.B., M.L., and Ashley shared a bedroom, which meant the children had the opportunity to perceive the abuse inflicted on Ashley. S.B. testified that she saw Lopez punch and thrust his torso onto Ashley's private parts. She also testified that she saw Lopez raise Ashley above his head and throw her onto the ground, both of which were corroborated by Dr. Crawford's testimony regarding Ashley's injuries. Moreover, S.B.'s testimony supported a finding that her failure to answer several questions was due to a fear of Lopez, and she acknowledged as much during direct examination. On cross-examination, the defense exhaustively questioned S.B. about any inconsistencies between her trial testimony and her preliminary hearing testimony, potential bias, and the possibility that she had been coached.

M.L. also testified at trial that he saw Lopez pick up Ashley and throw her onto the ground, cracking her head. He had no prior testimony with which the defense could impeach him, but he was cross-examined about possible coaching.

We reject Lopez's argument that a competency ruling under Evidence Code section 701 was not sufficient and that the trial court was required to hold a hearing under Evidence Code section 702. Here, as in *People v. Dennis* (1998) 17

Cal.4th 468, 526 (*Dennis*), "[the child witness] was an eyewitness to the events. Consequently, once the trial court properly determined [the witness] was competent to testify under Evidence Code section 701, it had no basis for excluding her testimony for lack of personal knowledge."

### 2. *Due Process*

Lopez contends that if the trial court's ruling under Evidence Code section 702 was not error, the children's testimony was nonetheless unreliable and violated his right to due process under the Eighth and Fourteenth Amendments to the United States Constitution. Lopez asserts the trial court failed to consider the effects of "brainwashing" and suggestive questioning.

In *Dennis*, we rejected the defendant's argument that the child witness's testimony was unreliable because of gaps in her memory and her discussions of the events with the prosecutor and others. (*Dennis*, *supra*, 17 Cal.4th at p. 526.) The witness's limited memories, we said, did not violate the defendant's right to confrontation; that right "secures to an accused an adequate opportunity to cross-examine adverse witnesses; it does not guarantee testimony free from forgetfulness, confusion, or even evasion." (*Ibid.*) We further rejected the notion that the witness's testimony was insufficiently reliable to satisfy the heightened standards of a capital case: "Also without merit is defendant's claim that [the child's] testimony was unreliable and, because it contributed to a judgment of death, it violated his constitutional rights under the Eighth and Fourteenth Amendments. Defendant was fully afforded the protections of the procedures constitutionally required to ensure reliability in the factfinding process. As we have previously remarked in rejecting essentially the same contention, defendant ' "was given an opportunity to be heard and to cross-examine in a judicial forum." ' " (*Ibid.*)

16

Lopez asks that we reconsider *Dennis* in light of studies that "conclude children are highly susceptible to suggestive questioning techniques like repetition, guided imagery, and selective reinforcement." (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 443.) But credibility is an issue for the trier of fact, and in the present case, the defense's cross-examination, which thoroughly explored the possibility of coaching or brainwashing, provided the jury with sufficient information to determine the credibility of S.B. and M.L. Additionally, the jury heard testimony from several other witnesses that supported the children's testimony; the jury did not have to rely on their testimony alone to determine that Lopez had committed the charged offenses. Harris and Laurie testified about Lopez's actions and Ashley's reactions during the week leading up to her death, and Dr. Crawford explained Ashley's injuries and their likely causes. The admission of the testimony from S.B. and M.L. did not violate Lopez's due process rights.

## B. Sufficiency of the Evidence

Lopez contends the evidence is insufficient to support his first degree murder conviction, the torture-murder special-circumstance finding, his conviction for committing lewd and lascivious conduct, and the enhancement for causing great bodily injury. We inquire whether evidence was presented from which a reasonable trier of fact could conclude, beyond a reasonable doubt, that the prosecution sustained its burden of proof. (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) We assess whether the evidence is inherently credible and of solid value, and we view the evidence in the light most favorable to the jury verdict.

### 1. Murder and Torture-Murder Special Circumstance

Lopez contends insufficient evidence supports a finding of deliberation and premeditation, murder by torture, or felony murder. Because we find sufficient

17

evidence to support a finding of premeditation and deliberation, we need not address Lopez's remaining contentions as to the sufficiency of the evidence of first degree murder. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 168 [when murder conviction is sufficiently supported under one theory, we need not consider additional claims].) However, because Lopez challenges the torture-murder special-circumstance finding, we will address the related question of the sufficiency of the evidence supporting murder by torture.

### a. *Premeditation and Deliberation*

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) The reflection may be arrived at quickly; it need not span a specific or extended period of time. (*Ibid.*) We have found planning activity, preexisting motive, and manner of killing to be relevant, although these factors do not " 'exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

The evidence here supported an inference that Lopez abused Ashley during times when Harris was asleep or not home. Harris testified that Lopez woke Ashley up every morning before he left work under the guise of changing her diaper, despite the fact that Ashley normally slept until much later without needing her diaper changed. A neighbor testified that Ashley was walking normally while playing outdoors on the morning of May 30, but by the time Harris returned from visiting Nicole in jail, Ashley was walking "funny." Lopez created several explanations throughout the week regarding the cause of Ashley's injuries: he told Harris that Ashley fell off the bed and injured herself on a bicycle, and he accused other children of hitting her. Laurie testified that Lopez did not want to take care

18

of Ashley and was unhappy with the financial strain it placed on his family. The jury heard evidence that Lopez may have assaulted Ashley as an attempt to punish Harris for allowing Ashley to stay with them. S.B. and M.L. testified that on the night before Ashley died, Lopez threw Ashley onto the floor, cracking her skull. Lopez returned Ashley to her bed and, the next day, tried to prevent Harris and Laurie from seeking medical care for Ashley.

A reasonable jury could conclude Lopez's actions showed his premeditated and deliberate intent to kill Ashley. He complained of the financial strain from having to take care of Ashley, suggesting a motive to harm the child. His continuing and escalating acts of abuse caused Ashley prolonged pain, he looked for opportunities to abuse her, and he made up excuses to explain the bruising or blamed other people for hurting her. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201–202 (*Whisenhunt*) [the defendant's continuing and escalating acts of abuse showed his premeditated and deliberate intent to eventually kill her].) A deliberate intention to kill is supported by the fact that Ashley was a small toddler, already weakened by several days of extreme abuse, when Lopez lifted her over his head and threw her to the ground. Lopez personally inflicted the injuries on Ashley that caused her weakened state, which placed him in a heightened sense of awareness of her fragility, further supporting a finding of premeditation in the act of harming her.

From this evidence of Lopez's escalating acts of abuse and conscious efforts to conceal his actions and prevent Ashley from receiving needed medical attention, a reasonable jury could conclude Lopez intentionally killed Ashley with preexisting thought and reflection.

### b. *Murder by Torture*

"To prove torture murder, the prosecution must establish ' "a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 237.) "The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body." (*Ibid.*) A perpetrator need not have any intent to kill, nor does the prosecution need to prove that the victim suffered pain. (*People v. Edwards* (2013) 57 Cal.4th 658, 716.)

The prosecutor presented sufficient evidence for a reasonable jury to conclude, based on Ashley's injuries and the nature of the abuse she suffered, that Lopez intended to inflict extreme and prolonged pain. Harris and Laurie testified that Ashley's bruising increased nearly every day leading up to Ashley's death, while Dr. Crawford testified that at the time of death she had more than 100 bruises over every part of her body. Dr. Crawford further testified that Ashley "was repetitively exposed to multiple episodes of blunt trauma, with pain being associated with each one." Dr. Crawford also testified that the bruising and tear on Ashley's genitals resulted from massive blunt force trauma and would have been very painful. Arzate testified that she repeatedly heard Ashley's "painful" cries in the days before her death, suggesting Lopez was aware that the child was in pain. Laurie testified that Lopez did not want to care for Ashley and felt burdened by the financial strain. The evidence is sufficient to show Lopez's willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for the purpose of revenge or another sadistic purpose.

Lopez's reliance on *People v. Steger* (1976) 16 Cal.3d 539 is misplaced. There, the defendant continuously beat her three-year-old stepdaughter and did so daily during the final week of her life. Like Ashley, the victim in *Steger*

20

ultimately died from a fatal head injury. The defendant admitted to beating the victim, telling the police she did so in an attempt to discipline the girl because she was frustrated with her behavior. In *Steger*, we found insufficient evidence that the defendant beat her stepchild with the intent to inflict extreme and prolonged pain. Rather, "several distinct 'explosions of violence' " took place whenever the child misbehaved. (*Id.* at p. 548.) Here, there is no evidence that Lopez's abuse of Ashley was a reaction to her misbehavior or was otherwise provoked.

We further conclude that sufficient evidence supported the jury's true finding on the torture-murder special-circumstance allegation. The special circumstance requires that a murder be "intentional" and "involv[e] the infliction of torture," which includes a torturous intent. (§ 190.2, subd. (a)(18); *Whisenhunt*, *supra*, 44 Cal.4th at p. 202.) As discussed, the evidence supports the jury's conclusion that Lopez intended to kill Ashley and that the murder involved the infliction of torture.

### 2. *Lewd and Lascivious Conduct and Great Bodily Injury Enhancement*

Lopez contends that because insufficient evidence supports a finding that he was the cause of Ashley's injuries, his conviction for forcible lewd or lascivious conduct (§ 288, subd. (b)(1)) and the enhancement for committing great bodily injury under section 12022.8 must be reversed.

Dr. Crawford testified that Ashley suffered a laceration extending from her vagina to her anus as well as severe bruising. He opined that the laceration would have occurred between 72 hours and at most one week before he saw Ashley on Friday, June 4, 1999. Dr. Crawford testified that the status of Ashley's injury on Friday was consistent with it having occurred on Sunday, May 30.

The evidence adduced at trial supported an inference that while Harris visited her daughter Nicole in jail on Sunday, May 30, Lopez tried to insert his

21

erect penis into Ashley's vagina, resulting in the laceration that extended from her vagina to her anus. The neighbor's testimony that Ashley appeared to be enjoying herself while playing outdoors Sunday morning is inconsistent with Lopez's assertion that Ashley's injury could have occurred before Laurie dropped her off the previous day. Harris noticed that Ashley was walking "funny" when she returned home, and she observed redness and bruising when she changed Ashley's diaper that afternoon. Lopez told Harris that Ashley had been playing outdoors without a diaper and injured herself on a bicycle that was missing a seat. Laurie saw blood on Ashley's diaper as late as Wednesday, which was the first time she had seen Ashley's genitalia since Saturday, May 29.

Similarly, the evidence supports an inference that the injury on Sunday produced the initial bruising, which was then exacerbated by ongoing trauma. Harris testified that the bruising appeared to worsen throughout the week, and S.B. testified that she saw Lopez punch Ashley in the genitals. S.B. further testified that she saw Lopez thrusting his pelvis against Ashley in the middle of the night, suggesting a separate incident from Sunday.

Finally, for the reasons above, sufficient evidence supports the jury's finding that Lopez inflicted great bodily injury. (§ 12022.7, subd. (f).)

## C. Admission of Evidence of Witness's Broken Leg

Lopez contends the erroneous admission of irrelevant and inflammatory evidence that he had broken S.B.'s leg and threatened to kill her rendered his trial fundamentally unfair.

S.B. suffered a broken femur in November 1998. S.B. told Harris, who did not see the injury occur, that she was sitting on her bed with her stomach against the footboard and her legs dangling between the footboard's vertical slats. S.B. tried to stand up too quickly; her body fell forward but her right leg stayed wedged

22

between two slats. S.B. crawled into the hallway toward the living room, where Harris was standing. An ambulance took S.B. to the hospital, where she stayed for 21 days. CPS conducted an investigation, after which S.B. returned to Harris's care.

Detective Bobbie Koller interviewed S.B. on June 4, 1999. In addition to discussing the events surrounding Ashley's death, Koller asked S.B. what had happened to her leg. S.B. told Koller that she broke it on her bunk bed in an accident. At a second interview on July 7, 1999, S.B. told Koller that Lopez had grown angry with her, picked her up, and threw her down, resulting in her broken leg. S.B. appeared afraid of Lopez and told Koller that Lopez threatened to hurt her again if she ever disclosed the source of her injury.

Shortly after Ashley's death, S.B. told other people that Lopez had broken her leg. Following Ashley's funeral, S.B. told Laurie that Lopez had broken her leg but had threatened that if she told anyone, he would kill her and Harris. Laurie testified that S.B. appeared "very very scared" during this conversation. Later that month, S.B. told her great-aunt Cindy Jardin that Lopez had broken her leg. S.B. also explained that she had not said anything sooner because Lopez had threatened to kill her. S.B. told her next foster mother, Debra Karavias, that Lopez had broken her leg and showed Karavias where she had screws in her knee. A few months later, S.B. explained to Karavias that Lopez had broken her leg by throwing her onto the floor.

S.B. moved to foster mother Beth Hanson's home in August 2000. When Hanson's daughter asked S.B. about the scar on her knee, S.B. replied, "That's when [Lopez] broke my leg." Hanson heard S.B. explain that Lopez "took her by the arms and threw her and that's how her leg broke." Occasionally, Hanson heard S.B. crying out from nightmares in the middle of the night. One night, S.B.

23

explained that Lopez was chasing her and going to kill her. On another night, she explained that Lopez was going to hurt her.

Before trial, defense counsel moved to exclude evidence regarding S.B.'s broken leg and Lopez's subsequent threats under Evidence Code section 1101, subdivision (b). The prosecutor responded that the evidence was being offered not under Evidence Code section 1101(b) but rather to show why S.B. initially lied about the cause of her injury, and was admissible on the issue of S.B.'s credibility and "her motivation for testifying the way she did." The trial court stated the evidence "would probably come in on redirect examination," assuming there would be inconsistencies between S.B.'s statements on direct and cross-examination. After hearing argument from both parties, the court ruled that the prosecutor could not refer to S.B.'s broken leg during his opening statement or question any witness about the leg on direct examination, but the evidence could be admissible depending on the cross-examination.

Just before S.B. took the stand, Lopez renewed his objection to any evidence of threats or abuse against S.B. On direct examination, S.B. testified that she saw Lopez punch Ashley and throw her onto the floor. On cross-examination, defense counsel questioned S.B. about inconsistencies with her testimony at the preliminary hearing. S.B. admitted that her great-aunt, Cindy Jardin, had told her to call Lopez "Wicked Mike." While acknowledging she spoke with Koller about Lopez hurting Ashley, S.B. said she did not recall most of their conversations. S.B. indicated she did not remember certain questions that had been asked of her in the past.

On redirect, S.B. answered affirmatively when the prosecutor asked if she was "nervous and afraid." When the prosecutor asked if she was afraid of Lopez, she did not answer. After the third attempt at asking that question with no

24

response, the prosecutor asked, "You don't want to answer that question, do you?" S.B. replied, "I don't."

Over Lopez's objection, the court allowed the prosecutor to ask S.B. whether Lopez had ever done anything to her. The court instructed the jury that the testimony was "limited strictly to the witness's state of mind, not for the truth of any answer the witness might give." When the prosecutor asked S.B. who broke her leg, again over objection, S.B. did not answer. The prosecutor asked S.B. if she remembered telling him, Laurie, Cindy, or her former foster mother Debra Karavias that Lopez had broken her leg. After each question, S.B. either did not answer or indicated that she did not remember. At the conclusion of redirect, defense counsel moved for a mistrial. The court denied the motion without prejudice and told defense counsel that he could argue the motion after the completion of S.B.'s testimony.

Defense counsel later renewed his motion, arguing that he never opened the door to the prosecutor's line of questioning. The court disagreed and denied the motion for a mistrial. Both Karavias and Laurie later testified regarding the statements S.B. made about her leg. In rebuttal, Dr. Crawford testified regarding his examination and treatment of S.B.'s broken leg.

" 'Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations.] Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.' " (*People v. Williams* (2013) 58 Cal.4th 197, 270 (*Williams*).) The trial court must balance the evidence's probative value against its prejudicial effect under Evidence Code section 352. (*Williams*, at p. 270.) The court has discretion to exclude evidence "if its

25

probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We find no abuse of discretion. The trial court appropriately found that the evidence was probative in that it would explain to the jury why S.B. was afraid to testify against Lopez, allowing the jury to accurately assess S.B.'s credibility and the inconsistencies in her testimony. The trial court limited any prejudicial effect by allowing the evidence to come in only on redirect pending the cross-examination. Additionally, the trial court instructed the jury that the evidence could be considered only for a limited purpose, and we presume the jury followed the trial court's instruction.

### D. Failure to Give Unanimity Instruction on Theory of Guilt

The trial court instructed the jury on three theories of first degree murder: premeditated and deliberated murder (CALJIC No. 8.20), murder by torture (CALJIC No. 8.24), and felony murder (CALJIC No. 8.21). Lopez contends the trial court committed reversible error by failing to require the jury to unanimously agree on the theory of first degree murder. We have previously rejected this argument (*People v. Geier* (2007) 41 Cal.4th 555, 592; *People v. Cole* (2004) 33 Cal.4th 1158, 1221; *People v. Kipp* (2001) 26 Cal.4th 1100, 1132), and Lopez offers no persuasive reason for us to revisit this precedent.

### E. Instruction on First Degree Murder

Lopez contends that the instructions permitting him to be convicted of first degree murder on any of the three theories presented violated his rights under the Eighth and Fourteenth Amendments because he was not charged with first degree murder. Lopez asserts that because he was charged only with second degree

26

murder under section 187, he cannot be found guilty of first degree murder. Lopez further contends the trial court lacked jurisdiction to try him for first degree murder. His argument rests on the premise that under *People v. Dillon* (1983) 34 Cal.3d 441, felony murder and premeditated murder are separate crimes and that *Dillon* implicitly overruled *People v. Witt* (1915) 170 Cal. 104, in which we held that a defendant may be convicted of felony murder even though the information charged only murder with malice.

But we have repeatedly rejected the claim that first degree murder and murder with malice are separate offenses. (*People v. Hughes* (2002) 27 Cal.4th 287, 369; *People v. Silva* (2001) 25 Cal.4th 345, 367; *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395.) We have likewise reaffirmed "that an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely." (*Hughes*, at p. 369.) Lopez offers no persuasive reason for us to revisit these holdings.

### F. Constitutionality of Special Circumstance

Lopez contends that the torture-murder special circumstance (§ 190.2(a)(18)) is unconstitutional because it fails to perform the narrowing function required by the Eighth Amendment and fails to ensure that there is a meaningful basis for distinguishing cases in which the death penalty is imposed from those in which it is not. He further contends that the special circumstance is overbroad. We have previously rejected these arguments (*People v. Bemore* (2000) 22 Cal.4th 809, 843), and Lopez provides no persuasive reason to revisit this precedent.

27

### III. PENALTY PHASE ISSUES

#### A. Coercion to Reach a Verdict

Lopez argues that the trial court improperly coerced a death verdict by refusing to address multiple assertions of deadlock from the jury and by failing to dismiss a juror who could no longer serve impartially.

The jury began penalty phase deliberations at 10:05 a.m. on Thursday, March 1, 2001. The jury deliberated until 4:10 p.m., including a break for lunch, and then adjourned for the weekend. The jury resumed deliberations without incident on Monday, March 5, and Tuesday, March 6. On Wednesday, March 7, the jury submitted a note to the court at 3:00 p.m., stating, "Jury is deadlocked." The court informed counsel of the note and indicated its intention to instruct the jury to break for the remainder of the day and to return the following morning to resume deliberations. Defense counsel asked the court to question the jurors to determine whether further deliberations would be helpful and, in the alternative, moved for a mistrial. The court declined to question the jury and denied defendant's motion, asserting it was too early in the process to warrant a mistrial.

The jury resumed deliberations on Thursday, March 8. At 11:20 a.m., the jury sent the court a note seeking clarification regarding which acts of violence could be considered an aggravating circumstance. The court conferred with counsel that afternoon and sent the jury a written response; this issue is discussed further below. The jury continued deliberating until 3:30 p.m. and then adjourned for the weekend.

The jury continued deliberations on Monday, March 12. On Tuesday, March 13, the jury began deliberating at 9:20 a.m. At 10:50 a.m., the jury sent the court a note stating, "This jury is a deadlocked jury, with no hope of resolution! Juror #5 has a prepaid trip to Arizona planned for the week of 3-19 to 3-25-01. #5

28

will not be available." At some point that day, the jury sent a second note to the court requesting that the alternates be allowed to return to work until needed, citing adverse impact on career growth for one juror.

The trial court asked the foreperson a series of questions regarding the number, timing, and division of the votes taken since the jury began deliberating. The foreperson estimated that the group had taken eight votes throughout the week. The foreperson indicated that the first vote resulted in a five-seven split and the two most recent votes resulted in a six-six split each, but could not recall the specific breakdown for the remaining votes.

The court then asked the foreperson if he felt there was a reasonable probability that the jurors could arrive at a verdict. The foreperson replied, "No, I do not." The trial court asked whether it could assist the jury by providing any additional instructions or having the reporter read back any testimony. The foreperson stated that additional instructions or guidance might be helpful, but he did not believe there was confusion in the minds of the jurors. The court asked Juror No. 1 if she agreed that further deliberations would not result in a verdict; the juror agreed. The court asked the same question of Juror No. 3, who replied, "I'm not sure that I do [agree]." At that point, the court instructed the jury to continue deliberating and said it would await further communication from the jury. Later that afternoon, the jury sent a note seeking clarification of the definitions of "extreme duress" and "lingering doubt." The court conferred with counsel and sent a written response defining "duress" and directing the jurors to the instructions for the definition of "lingering doubt."

The jury deliberated on Wednesday, March 14, without incident. The following morning, on March 15, Juror No. 8 requested to speak with the court privately. With the court and counsel convened in chambers, Juror No. 8 asked to be dismissed from the jury. Juror No. 8 said she had "reached a level of

29

intolerable stress" and "felt as though [she] was going to snap." She explained that the stress of the long trial and deliberation process was affecting her health and made her "more and more tense every day." She said it was affecting her job because she tried to do a full day's worth of work in an hour or two each day after deliberating, but she struggled to keep up and remember what work she had done. She told the trial court, "I wake up crying at night because of the gravity of this case, and how I take it seriously, and I just want to ask to be taken off the case." The court acknowledged that the jurors had been working hard and asked Juror No. 8 to continue to participate. The court said that if after further deliberations "you still feel that it's just too stressful and it's at the point again where it's interfering with your health, tell the bailiff, again, and we'll talk to you, again." Juror No. 8 expressed a willingness to try and returned to the jury room.

After the juror left chambers, the prosecutor stated his belief that the juror should be removed. The court responded, "If she had indicated a reluctance to continue — I'm not saying that she was enthusiastic about it — I would have granted her request. But I — it's hard to know when, you know, when frustration kind of goes beyond that level." The prosecutor responded that the juror did indicate reluctance and "almost broke down into tears. I could see the lips quivering." The court replied that it "didn't see that" and said that if Juror No. 8 spoke up again, she would be dismissed, but "not at this point." Defense counsel did not object to the court's ruling or otherwise indicate any concerns with the court's action.

Defense counsel reminded the court that Juror No. 5 had a prepaid vacation starting the following Monday. The court responded, "I expect something to happen today, at least as far as Juror No. 8 is concerned. If she asks to be excused again for the reasons she's indicated, I'm going to grant her request. Obviously, I'll notify counsel if I hear anything further from her. I believe after hearing about

30

[Juror No. 5] having to leave, something is going to happen today. Let's just stay tuned." The jury returned with a death verdict at 2:20 p.m. that afternoon.

### 1. *Pressure to Reach a Verdict*

Section 1140 provides in relevant part that a "jury cannot be discharged" without having rendered a verdict unless, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." "The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion." (*People v. Debose* (2014) 59 Cal.4th 177, 209.) "However, a court must exercise its power under section 1140 without coercing the jury, and 'avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." ' [Citation.] As this court has explained, '[a]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 88.)

We conclude that the trial court did not coerce the jury to reach a verdict. Lopez emphasizes the court's failure to respond to the jury's multiple declarations of deadlock and concerns about their personal circumstances. But the court responded to the second note of deadlock by questioning individual jurors on whether he or she believed the jury was deadlocked and whether the court could do anything to assist the process. (See Cal. Rules of Court, rule 2.1036(a) [when a deadlock is reported, the judge should ask jurors whether they have "specific concerns which, if resolved, might assist the jury in reaching a verdict"].) The foreperson acknowledged that "additional instructions or guidance . . . may be of some assistance," and another juror indicated that further deliberations could result in a verdict. The court did not abuse its discretion when it ceased the questioning at that point and ordered the jury to continue deliberating. The trial court had

31

sufficient basis to conclude there was a reasonable probability a verdict could be reached. The court did not state or imply to the jury that it must reach a particular outcome, nor did it coerce the jury to reach a verdict.

The trial court's failure to address Juror No. 5's upcoming prepaid trip likewise did not coerce the jury to reach a verdict. Lopez asserts this failure could have led the juror to believe she would not be dismissed for her vacation and could have led the jury to believe it would be forced to continue to deliberate until a verdict was reached. However, at the time Juror No. 5 reminded the court of her vacation, the jury was seven days into its deliberations, alternate jurors were available, and more than two full days of deliberation remained before Juror No. 5 would become unavailable. It is unlikely the jury would have understood the trial court's failure to respond specifically to Juror No. 5's situation as a command to keep deliberating indefinitely until a verdict was reached.

### 2. *Refusal to Discharge Juror*

The trial court may discharge a juror at any time if good cause exists to find that the juror is unable to perform his or her duty. (§ 1089.) "The trial court's decision whether or not to discharge a juror under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence; to warrant discharge, the juror's bias or other disability must appear in the record as a demonstrable reality." (*People v. Holloway* (2004) 33 Cal.4th 96, 124–125.) A reviewing court does not reweigh the evidence but "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.)

The court did not abuse its discretion by leaving Juror No. 8 on the panel. Although the juror explained that the trial had caused her stress and prevented her from doing her job, at no time did she indicate that she could no longer serve

32

impartially as a juror. It is true that Juror No. 8 asked to be excused from the jury. But when the trial court asked her to continue participating and assured her that the court would talk to her again if she continued to feel the deliberations were too stressful and were interfering with her health, the juror was willing to continue. Although the trial court did not specifically ask the juror if she was able to continue deliberating impartially or permit counsel to ask questions, the juror's responses indicate a willingness to continue to deliberate as she was originally instructed to do. In these circumstances, the trial court's decision not to dismiss the juror was not an abuse of discretion.

## B. Trial Court's Response to Jurors' Question

Lopez contends that the trial court's response to a jury question regarding its consideration of acts of violence, coupled with the prosecutor's argument, allowed the jury to consider inadmissible evidence during its penalty determination.

As noted, the prosecutor introduced evidence of five prior violent incidents at the penalty phase under section 190.3, factor (b): an October 1992 incident involving an alleged assault and resisting arrest; a May 1986 incident involving alleged assaults and resisting arrest; an August 1991 incident involving Lopez's ex-wife and her son, alleging an assault with a deadly weapon; a June 1999 incident involving an alleged assault on M.L.; and a December 1990 incident involving an alleged assault and resisting arrest. The record contained evidence of additional instances of violence, including allegations that Lopez physically assaulted and threatened S.B., physically and verbally abused Harris, and hit Harris's grandson. During his opening statement, the prosecutor told the jurors they could "consider anything you heard in the first part of the trial in arriving at your verdict."

33

The trial court instructed the jury, pursuant to CALJIC No. 8.85: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as hereafter instructed." Pursuant to CALJIC No. 8.87, the court instructed the jury that it could consider the five violent criminal acts as aggravating circumstances, but it "may not consider any evidence of any other criminal acts as an aggravating circumstance."

On the fifth day of deliberations, the jury sent the court a note seeking clarification regarding the prior acts of violence. The note read, "Can any acts of violence be considered as an aggravating circumstance or are we limited to the 5 acts of violence listed on 8.87 of the jury instructions? 'A juror may not consider any evidence of any other criminal acts as an aggravating circumstance' vs. C8841 [sic] 'you must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise.' " Defense counsel requested a simple "no" to the question regarding consideration of any acts of violence, and a "yes" to the question of whether the jurors were limited to the five acts of violence listed in CALJIC No. 8.87.

Over defense counsel's objection, the trial court sent the following response to the jury: "You have asked if *any* acts of violence may be considered as an aggravating circumstance, or, are you limited to the 5 acts of violence listed in 8.87 of the jury instructions. [¶] Under instruction 8.85, you are limited to the 5 acts of violence alleged to have occurred and listed in instruction 8.87 *as aggravating circumstances.* Before a juror may consider any such criminal act as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal act. [¶] Under instruction 8.85, you shall consider all the evidence which was received during both the guilt and penalty trials in determining which penalty is to be imposed on

34

the defendant. You shall consider, take into account and be guided by all the factors in that instruction which you find to be applicable." Lopez specifically objected to inclusion of the third paragraph. On appeal, he asserts that the trial court's response, coupled with the prosecutor's opening statement during the penalty phase, erroneously led the jury to believe it could consider inadmissible evidence as aggravating factors.

The trial court did not erroneously lead the jury to believe it could consider inadmissible evidence as aggravating factors. The court's response correctly summarized the instructions. CALJIC No. 8.85 authorizes the jury to consider all evidence presented in determining an appropriate penalty, but as the trial court made clear, this instruction is subject to a limitation: "*Under instruction 8.85*, you are limited to the 5 acts of violence alleged to have occurred and listed in instruction 8.87 *as aggravating circumstances*." (First italics added.) Although the trial court's response generally summarized CALJIC No. 8.85's directive that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as hereafter instructed," it left out the statement "except as hereafter instructed." Even without that phrase, however, the court's response did not expressly contradict or impliedly conflict with CALJIC No. 8.85.

The court's response also reminded the jury that the aggravating circumstances were "limited" to the five acts of violence listed in CALJIC No. 8.87, and the jury was told to consider the factors "which you find to be applicable." The trial court's use of the word "limited" conveyed that only the five acts in CALJIC No. 8.87 could be considered aggravating. The jury thus presumably understood that it could not consider other violent acts as aggravating circumstances. Notwithstanding the prosecutor's opening statement, the trial court's instructions and response to the jury's questions correctly stated the law.

35

Lopez points to nothing in the record suggesting the jury did not follow the trial court's instructions regarding proper consideration of the evidence presented.

### C. *Griffin* Error

Lopez contends that the prosecutor committed error under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) when he improperly referred to Lopez's failure to testify and lack of remorse.

In his closing argument, the prosecutor referred to the defense witnesses who gave mitigating character evidence, stating, "Other than the fact that Michael Lopez was kind to them, brought them flowers, drew cards and cartoons for them, babysat for them, I didn't hear any one of them say Michael Lopez had any remorse for this crime. Not one." The prosecutor then discussed the testimony of Lopez's parents, arguing, "Did you ever hear Mr. or Mrs. Lopez say: Michael Lopez told me, sorry, Mom, for breaking your heart. Sorry, Mom, for putting you through this all these years. Sorry, Mom, for having you come to court and having you beg for my life. Sorry, Mom, for—" The court sustained defense counsel's objection and told the prosecutor to "move on." The prosecutor continued, "Did you ever hear one word of remorse from him?" Defense counsel again objected, citing *Griffin*. The court responded, "I had sustained your objection. [Prosecutor], move on." The court denied Lopez's motion for a mistrial. The prosecutor moved on to a discussion of sympathy and lingering doubt.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin*, *supra*, 380 U.S. at p. 615; see *People v. Thompson* (2016) 1 Cal.5th 1043, 1117.) But there is a difference between a prosecutor's comment

that a defendant failed to take the stand to express remorse and a prosecutor's comment that there was no evidence that a defendant had ever expressed remorse. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1174 ["the prosecutor did not comment that defendant had failed to *take the stand* to express remorse; he simply said there was no *evidence* that defendant had *ever* expressed remorse"].) "So long as the prosecutor's argument does not amount to a direct or indirect comment on the defendant's invocation of the right to silence at the penalty phase [citations], it does not violate constitutional principles." (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) Here the prosecutor did not comment on Lopez's decision not to take the stand. Rather, he pointed out that none of the mitigation witnesses testified that they heard Lopez express remorse at any point when he asked the jury, "Did you ever hear one word of remorse from him?" This comment was in reference to statements Lopez had made to his parents outside of proceedings; it was not referring to his failure to show remorse to the jury directly by not testifying. Such commentary was not improper.

### D. Admission of Rebuttal Character Evidence

Lopez contends that the evidence he had committed welfare fraud was improperly admitted and violated his rights to a fair trial and reasonable penalty determination.

After Lopez's case in mitigation, the prosecutor sought to introduce evidence that he had previously committed welfare fraud. Over defense objection, Jennifer Hazeltine, a welfare fraud inspector with the district attorney's office, testified that in June 1996 she received a referral regarding possible welfare fraud by Lopez. Hazeltine discovered that for seven months, while receiving food stamps and general assistance, Lopez had failed to report his income. Lopez

37

unlawfully received a total of $2,705.  Lopez admitted his failure to report his income and arranged to repay the amount at $40 per month.

If a defendant introduces character evidence during the penalty phase, the prosecution may respond with character evidence of its own to undermine the defendant's claim that his good character weighs in favor of mercy.  (*People v. Loker* (2008) 44 Cal.4th 691, 709 (*Loker*).)  "The scope of proper rebuttal is determined by the breadth and generality of the direct evidence.  If the testimony is 'not limited to any singular incident, personality trait, or aspect of [the defendant's] background,' but 'paint[s] an overall picture of an honest, intelligent, well-behaved, and sociable person incompatible with a violent or antisocial character,' rebuttal evidence of similarly broad scope is warranted."  (*Ibid*.)

At the same time, we have rejected the notion that *any* good character evidence introduced by the defendant will open the door to *any* bad character evidence.  (*Loker*, *supra*, 44 Cal.4th at p. 709; see *People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24.)  "When a witness does 'not testify generally to defendant's good character or to his general reputation for lawful behaviors, but instead testifie[s] only to a number of adverse circumstances that defendant experienced in his early childhood,' it is error to 'permit[ ] the prosecution to go beyond these aspects of defendant's background and to introduce evidence of a course of misconduct that defendant had engaged in throughout his teenage years that did not relate to the mitigating evidence presented on direct examination.' [Citations.]"  (*Loker*, at pp. 709–710; see *People v. Ramirez* (1990) 50 Cal.3d 1158, 1193.)

Lopez contends the evidence was improperly admitted because he did not introduce evidence concerning his reputation for honesty.  But Lopez did present testimony concerning his strong Christian beliefs, church attendance, and daily prayers.  (See *People v. Ramos* (1997) 15 Cal.4th 1113, 1173 [in light of evidence

38

of the defendant's religious recommitment, the prosecutor properly could introduce evidence of acts tending to contradict that impression]; *People v. Siripong* (1988) 45 Cal.3d 548, 578 [evidence that the defendant was a " 'devout Buddhist' " opened the door to inquiry on prior convictions].) Additionally, Lopez introduced testimony from a mental health expert regarding his low IQ. He did not object when the prosecutor asked the expert if such a person could be capable of committing welfare fraud. The expert acknowledged that a person with Lopez's IQ could lie. The trial court did not abuse its discretion in allowing the prosecution to introduce the welfare fraud evidence to rebut Lopez's character evidence.

## IV. OTHER ISSUES

### A. Challenges to the Death Penalty

Lopez mounts a number of challenges to California's death penalty law that our prior decisions have considered and rejected. He provides no persuasive reason for us to reexamine the following conclusions:

"California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment." (*Williams*, *supra*, 58 Cal.4th at p. 294.)

" '[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court.' [Citation.] We further 'reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death.' " (*People v. Maciel* (2013) 57 Cal.4th 482, 552–553.)

The death penalty statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 126 (*Snow*).) The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 have not altered these conclusions. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 41 (*Demetrulias*).)

The trial court need not instruct the jury that it must return a sentence of life without the possibility of parole if it finds that mitigation outweighs aggravation. (*People v. Duncan* (1991) 53 Cal.3d 955, 978.)

The death verdict need not be based on unanimous jury findings. "While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess such potentially aggravating factors as the circumstances of the capital crime (§ 190.3, factor (a)), prior felony convictions (*id.,* factor (c)), and other violent criminal activity (*id.,* factor (b)), and decide for him- or herself 'what weight that activity should be given in deciding the penalty.' [Citation.]" (*Demetrulias*, *supra*, 39 Cal.4th at p. 41.) A unanimous finding regarding the mitigating factors is similarly not required. (*People v. Bryant* (2014) 60 Cal.4th 335, 457.)

CALJIC No. 8.88 is not impermissibly broad. (*People v. Breaux* (1991) 1 Cal.4th 281, 316, fn. 14.)

Instructions on the meaning of a sentence of life imprisonment without the possibility of parole and on the " 'presumption of life' " were not constitutionally required. (*Demetrulias*, *supra*, 39 Cal.4th at p. 43.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*Snow*, *supra*, 30 Cal.4th at p. 126.)

"The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors, nor must it identify which factors are aggravating and which are mitigating." (*People v. Cook* (2006) 39 Cal.4th 566, 618.)

"The capital sentencing scheme does not violate equal protection by denying to capital defendants procedural safeguards that are available to noncapital defendants." (*People v. Thomas* (2012) 53 Cal.4th 771, 836 (*Thomas*).)

California's death penalty does not violate international law or international norms of decency. (*Thomas*, *supra*, 53 Cal.4th at p. 837.)

## B.  Cumulative Error

Lopez contends that the cumulative effect of the errors during his trial mandates reversal. Because we have found no error, there is no cumulative prejudice to evaluate.

## CONCLUSION

We affirm the judgment.

LIU, J.

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**FYBEL, J.**\*

---

\* Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Lopez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S099549
**Date Filed:** June 28, 2018

_____

**Court:** Superior
**County:** Alameda
**Judge:** Philip V. Sarkisian

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Evan Young and Janet R. Gilger, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Glenn R. Pruden and Alice B. Lustre, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Evan Young
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 452-8712

Alice B. Lustre
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3821