Filed 5/18/22  P. v. Gallardo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>ERIC GALLARDO,<br><br>      Defendant and Appellant. | F079072<br><br>(Super. Ct. No. F16900466)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Law Offices of Beles & Beles, Robert J. Beles, Paul McCarthy and Manisha Daryani for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Eric Gallardo of second degree murder (Pen. Code, § 187, subd. (a); count 1)[1] for the shooting death of Anthony Leon Jones.[2] The jury found true that (1) appellant intentionally discharged a firearm that proximately caused great bodily injury or death (§ 12022.53, subd. (d)) and (2) appellant personally used a firearm (§ 12022.5, subd. (a)). Appellant received a prison sentence of 15 years to life for the second degree murder, along with a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).[3]

Appellant contends that his conviction and the jury's true findings must be reversed. He raises a series of claims regarding prosecutorial misconduct based on comments made during closing arguments. He also asserts that the trial court erred when it directed the jury, which became deadlocked, to continue its deliberations. We reject these arguments. However, we agree with appellant's supplemental claim that the trial court must be given an opportunity to exercise its new sentencing discretion regarding the firearm enhancement which the jury found true under section 12022.53, subdivision (d). (See *People v. Tirado* (2022) 12 Cal.5th 688, 700 [under certain circumstances, a trial court may impose a sentencing enhancement under § 12022.53, subd. (b) or (c) instead of under subd. (d)] (*Tirado*).) We conditionally reverse appellant's sentence but otherwise affirm.

## BACKGROUND

It was undisputed at trial that appellant shot and killed Jones.[4] The fatal incident was captured on surveillance video and played for the jury. The prosecutor argued for

---

[1]     All future statutory references are to the Penal Code unless otherwise noted.

[2]     The jury found appellant not guilty for first degree murder.

[3]     The court imposed 10 years in state prison for the firearm enhancement under section 12022.5, subdivision (a). This sentence was stayed.

[4]     Jones was known as "Chicken."

2.

first degree premeditated murder. The defense asserted that appellant did not commit murder. According to the defense, appellant acted either in self-defense, or under a heat of passion, or in imperfect self-defense. The jury rejected the competing positions and found appellant guilty of second degree murder.[5]

## I. The Murder.

Appellant did not know Jones, and he had never seen him before. Appellant shot Jones to death on January 23, 2016. This shooting occurred near the entrance to a small store located in the County and City of Fresno.

As seen in the video, appellant and Jones briefly exchanged blows just prior to the fatal shots. It was appellant who initiated the brief physical encounter. Appellant punched Jones, who appeared to either punch back or attempt to deflect appellant's blow. After being struck by appellant, Jones stumbled towards a wall but he remained standing.[6] At the same time, appellant stepped back several paces and he retrieved a handgun which he had concealed under his shirt. Appellant, who was standing just outside the open front doors to the store, fired multiple shots at Jones, who was standing just inside the store. Appellant fired just as Jones took a step towards him.[7] Jones never displayed a weapon, and he fell to the ground inside the store. Eyewitnesses saw appellant run away, and he got into a car and sped off.

---

[5] During deliberations, the jury announced it found appellant not guilty of first degree murder. However, the jury twice informed the trial court that it was deadlocked on the remining underlying charges. We address this deadlock in greater detail later in this opinion when we address appellant's claim that the trial court erred in directing the jury the second time to continue its deliberations.

[6] Appellant is about six feet three inches tall, and he weighed about 240 or 250 pounds at the time of trial. Jones was five feet eight and a half-inches tall. He weighed 213 pounds at the time of his autopsy. Jones was 38 years old. At trial, witnesses described Jones as "fit" and "pretty stocky."

[7] Based on the angle of the video, it is impossible to see Jones's hands as appellant initially fires.

3.

Before appellant fired, eyewitnesses heard him yelling at Jones. According to one eyewitness, appellant had asked Jones why he had touched his daughter, or why he had talked to his daughter. Another eyewitness heard appellant say, "come on, mother fucker." Appellant pulled out a gun and began to shoot.

## II. The Forensic Evidence

Emergency personnel responded and Jones was transported to a hospital. He died a short time later.

Law enforcement located five spent shell casings around the area where appellant had fired his handgun.[8] Two expended bullets were recovered inside the store. Law enforcement never found a weapon near Jones or anywhere inside the store.[9]

An autopsy revealed that appellant's shots struck Jones three times. The cause of death was "perforation of the left lobe of the liver and aorta due to [a] gunshot wound to the abdomen."[10]

---

[8] At trial, a detective was shown the video of the shooting and he agreed that the location of the recovered five expended casings were consistent with where the shooter was seen firing and moving during the shooting.

[9] One responding police officer, Eric Ovalle, believed at trial that he had been told a handgun had been "located by the counter where the clerk was." Ovalle believed it was another officer who told him this but he could not recall. Ovalle testified at trial that he believed there was a gun on the store's counter. Ovalle admitted at trial, however, that he did not indicate in his report that a firearm had been found at the scene. On cross-examination, Ovalle agreed that he had an independent recollection of a firearm on the counter despite that not being in his police report. This court has reviewed the video depicting the shooting. At no time is a firearm seen on the store's counter just prior to or just after this shooting.

[10] At the time of his autopsy, Jones had alcohol in his blood at 0.16 milligrams percent. Traces of phencyclidine (PCP) and marijuana were detected. The medical doctor who performed the autopsy did not believe that the level of marijuana was significant. The doctor agreed on trial cross-examination that PCP can make someone aggressive.

4.

## III.    Just Prior to this Shooting, the Victim had Interacted with Appellant's Wife.

The jury learned that this fatal shooting stemmed from a negative interaction between Jones and appellant's wife, Rosalinda.  The negative interaction between Jones and Rosalinda occurred earlier that same day.

According to Rosalinda, she had been visiting her relatives at a residence that was down the street from the store in question.  She arrived there sometime around 4:00 p.m. That same afternoon, Jones came into the residence.[11]  According to Rosalinda, Jones had "reeked of alcohol."  He sat right next to her on a couch.

Rosalinda told the jury that Jones acted inappropriately with her.  Her daughter, who was about 18 months old at the time, was fussy and crying.  The baby was resting on a reclining chair nearby.  At some point, Jones pushed Rosalinda on her shoulder, telling her to "get" the baby, who continued to cry.  About 30 seconds later, Jones "shoved" Rosalinda again harder with his elbow.  He again told Rosalinda to get the baby.  She told the jury that Jones had sounded "more serious this time."  She believed that Jones was getting more irritated because the baby was crying.

Rosalinda testified that, at some point, Jones "kicked the couch" on which the baby was resting.  This startled the baby, who began to cry more.  Rosalinda stood up. When she did, Jones pinched her butt.  She told the jury that he did so "in the center" of her butt towards her "butthole."  She said it felt like he had touched her anus.[12]

Rosalinda testified that she "got scared" and she was "startled."  She explained that she was scared because Jones had "violated" her and he had scared her daughter. She did not know "what else he was going to do."

---

[11]    Jones was friends with Rosalinda's mother and one of Rosalinda's aunts.

[12]    Rosalinda was wearing a T-shirt and "yoga pants" when this occurred.

Jones went into the backyard for a short time. Rosalinda told her aunt what had happened. She said that somebody had better talk to Jones "before I call [appellant] over here." At trial, she agreed that appellant had protected her throughout her entire life.[13]

Rosalinda's aunt confronted Jones about what had happened. The aunt asked Jones to leave, but he remained for about 10 minutes. According to Rosalinda, Jones kept staring at her. She believed he was staring at her breasts. This made her feel uncomfortable and afraid. She testified that she got "like an ugly feeling" in her stomach "like if he was going to attack me." She described Jones as "pretty stocky." At some point, Rosalinda told Jones that she was calling appellant. He told her to go ahead and call whomever she wanted.

**IV.    Rosalinda Called Appellant and Told Him About Jones's Behavior.**

Rosalinda called appellant. She was crying. She testified that she was scared and was "kind of like hyperventilating, you know, like I couldn't control my emotions." According to Rosalinda, she told appellant that she had been pinched and grabbed on her ass. She told him it was a friend of her aunt and mom who did this. The man was known as "Chicken," but she did not know him. She said that Chicken had also kicked at their youngest daughter. She asked appellant to come over, saying she needed his help. Appellant asked her how Chicken had touched her and she said, "he touched me on my butt, like he pinched me on my butt." She told him, "I just don't feel comfortable" and "can you come over." She told the jury that she called appellant so he could protect her.

---

**13**    Rosalinda told the jury that she had been in foster care most of her childhood. She had always relied on appellant to protect her. She started a romantic relationship with appellant when she was 13 years old and he was 14 years old. She was in foster care at the time. They had their first child together three years later. Appellant was 23 years old when this murder occurred.

6.

Before appellant arrived, Jones came up to Rosalinda outside the residence and he tried to hug her. She backed away from him. According to Rosalinda, Jones shrugged his shoulders and was like, "Well, fuck you then." Jones walked down the street.

One of Rosalinda's aunts testified at trial that she and her sisters tried to talk to Jones. She knew him, but he did not want to talk to her. The aunt asked Jones to apologize "because it's foul what you did." According to the aunt, Jones did not apologize but instead "attacked" or "grabbed" Rosalinda again. The aunt heard Jones say, "Hey, I'm sorry, I've been drinking."

## V.      Appellant Arrives and Rosalinda Tells him Where Jones Went.

Before appellant arrived, Rosalinda received a text message from appellant. He wrote, " 'I'm—I'm just going to beat him up.' " Appellant arrived about 20 minutes after Rosalinda had called him.[14] She met him outside the house. She said a lot of family members were also outside, and it was very emotional. Everybody was talking about everything that had happened. Rosalinda testified that she was "hysterical" and crying. Appellant asked her where Chicken was and she told him that he was down at the store.

Appellant began walking "fast" down the street towards the store. He was wearing shoes that he loved, but he walked through "a big puddle of water." This surprised Rosalinda and it appeared "weird" to her because he always took care of those shoes. She then heard gunshots. She saw appellant get into his vehicle and "take off."

Rosalinda agreed at trial that, when appellant had arrived, she had pointed out the direction where Jones was and she had assumed appellant was going to protect her. She told the jury it was not okay for somebody to scare her daughter and then touch her like that. She said, "I would assume that anybody would feel threatened." She told the jury

---

[14]      Appellant was at a hospital, or just leaving it, when Rosalinda called him. The prosecution established that it would take about 20 minutes for a person to drive from that hospital to the residence where appellant met Rosalinda just before this shooting occurred.

7.

that she knew appellant had firearms. However, she claimed that she had not known that he had been armed when he confronted Jones.

## VI. Appellant's Statements to Rosalinda after this Shooting.

Before law enforcement located appellant and arrested him, Rosalinda talked to him and he told her what had happened. According to Rosalinda, appellant said he got to the store and he had asked, "Who's Chicken?" Jones had started laughing and he told appellant, "I'll get to you in a minute." Appellant told Rosalinda that he got mad and they started fighting. Appellant told Rosalinda that he thought Jones had hit him on his face with a bottle. Appellant said he had "blacked out" and "just started shooting." Appellant admitted to Rosalinda that he had shot Jones.

## VII. Appellant's Statements to Detectives.

On January 25, 2016, law enforcement located appellant in the Stockton area. He was taken into custody without incident. Late that night, two detectives interviewed him. The interview was recorded with both audio and video. The recorded interview was played for the jury.

Appellant stated that he did not confront Jones with an intent to kill. Instead, he only wanted to fight. According to appellant, he brought along a firearm because he did not know Jones and he was concerned that Jones might be armed.[15] Appellant said he shot Jones because he became "scared" after the initial exchange of blows. Appellant said that Jones was big. Appellant thought Jones might have hit him with a bottle. Appellant also stated he thought Jones had been "reaching" for something. Appellant claimed he had "blacked out" just before he began shooting. Appellant said he shot because "I got scared." When asked what Jones had done to make him scared, appellant simply responded that he "blacked out." He later told the detectives that he has a quick

---

**15** During his interview with the detectives, appellant denied knowing the location of the firearm he used to kill Jones.

8.

temper. "It takes a lot to get me mad but once I'm mad I lose it. I black out. I've been like that ever since I was little." He said that other occasions had occurred where he has blacked out and he could not remember what he did.

Appellant was reluctant to identify Rosalinda as the person who had called him. Appellant initially said that "Tia" had called him, telling him that someone had been touching his kids and had "grabbed her and pushed her and he was feelin' on her." Appellant told the detectives that he did not get "the whole story" but he just knew that his "kids were in danger and I had to get there."

Later, appellant made statements from which it can be inferred he was describing Rosalinda as the person who had informed him about Jones's actions. He told detectives that she had sounded "hurt" and "scared." A little later appellant stated it was his understanding that his baby had been crying and Jones "kept telling her" to get the baby. Jones had approached "her" and "I guess grabbed" her. According to appellant, Rosalinda had told Tia that Jones kept "disrespecting" her, and he "did it again."

Appellant agreed with a detective who summarized that Jones had "grabbed" Rosalinda's "ass." Appellant clarified that "the aunt" did not see the incident, but Rosalinda had told everyone that Jones was making her "so uncomfortable." Jones was much older and kept doing "stuff" that she did not want. Appellant agreed that he thought Jones had touched Rosalinda in an "inappropriate way." It was appellant's understanding that Jones had "grabbed" her "on the side" but he did not know if it was done for sexual gratification. Later, appellant said he thought Jones had been "fondling my child."

The detectives reviewed the surveillance video with appellant, who stated that he remembered telling Jones that he could "never again" touch his daughter. Appellant agreed that Jones had hit him in his mouth. Appellant initially thought Jones might have hit him with a bottle because it did not feel like a punch. After reviewing the footage, appellant expressed surprise that Jones had hit him with a fist. Appellant stated that,

9.

from his perspective, he had not known what was on the store's counter or what Jones might have grabbed. Appellant, who was wearing braces when this fight occurred, realized that his braces could have caused it to feel more than a punch.[16]

Appellant told the detectives that he had not wanted to "go over there" after Rosalinda had called him. He denied that he had been afraid, and stated he had not known "that was gonna [*sic*] happen." He agreed he had only intended to fight Jones. A short time later, appellant said he "made a big mistake." Even later, appellant said that Jones "didn't deserve" what had happened. Appellant reiterated that he had "blacked out."

## DISCUSSION

### I. Appellant Has Forfeited His Claims of Prosecutorial Misconduct; In Any Event, No Misconduct Occurred and/or any Error Was Harmless.

Appellant raises a series of claims alleging prosecutorial misconduct based on various statements the prosecutor made during closing arguments. He seeks reversal of his conviction and the true findings.

#### A. Background.

Appellant's claim of prosecutorial misconduct is based on three separate concerns. First, he contends the prosecutor misstated the law regarding heat of passion. Second, he asserts the prosecutor improperly vouched for her own credibility. Finally, he maintains the prosecutor improperly disparaged defense counsel. We summarize the prosecutor's disputed comments.

---

**16** In the video, it appears that Jones raised his left arm and struck appellant's mouth as appellant punched Jones. During the interview, the detectives saw that appellant's tongue had been cut. A photograph of appellant's tongue was taken and it was shown to the jury. At trial, Rosalinda testified that she met appellant after the fatal incident and he showed her his tongue. She remembered the wound being "way bigger" than depicted in the photograph.

10.

**1.    The prosecutor's disputed comments regarding heat of passion.**

During her closing arguments, the prosecutor urged the jury to find appellant guilty of first degree premeditated murder. She contended that appellant purposefully armed himself with a loaded weapon to bring to this fight "if he needed it." She argued that he quickly reached a "cold and calculated" decision to kill.

The prosecutor argued to the jury that the facts did not establish a heat of passion. We highlight in italics the disputed comments the prosecutor made regarding heat of passion. She asserted that a heat of passion defense "boils down to" whether or not appellant "*was so out of it he couldn't control himself.*" She noted that the provoking event was appellant's conversation with Rosalinda. The prosecutor questioned whether it was sufficient that Rosalinda "had been groped in the buttock" and that someone was "kicking at" appellant's child. "Is that enough to have *caused a reasonable person to be so out of their mind that they would then kill someone*?"

A short time later, the prosecutor asked the jury if it was reasonable that appellant had fought with Jones and shot him "because he was so overcome with emotion and feelings that he just—he's not responsible for what happened next because *he wasn't in his right mind.* Would a reasonable person act like that?"

The prosecutor argued it took appellant at least 20 minutes to drive across town to meet Rosalinda after she had called him, and he shot Jones minutes later. According to the prosecutor, appellant had time to "take a breath, to turn in the opposite direction, to call the police if he really thinks that something was going down, to do something other than what he did, but look at what he did. *He's not so out of his head* with emotion that he's not thinking through his plan. He has—he goes and makes sure he has a firearm, makes sure it's loaded, and he gets himself all the way down there. He thought this through. And the fact that he was able to take that kind of time to think about what he was going to do next, that shows you this thought process and deliberation that *he's not so out of his mind at all*. [¶] He's making decisions. They may not be the decisions that

11.

you and I would make, but he's making decisions, nonetheless, which shows this thought process and deliberation, which means that he wasn't so overcome with emotion."

The prosecutor reminded the jurors that appellant had expressed to the detectives that he had not wanted to drive over to meet Rosalinda after she had called him, but he went anyway. According to the prosecutor, this showed that "*he's not out of his mind* in this uncontrollable rage or emotion. He's thinking this through."

Finally, in her rebuttal argument, the prosecutor stated that "[h]eat of passion is, I *was so out of my mind that I didn't know what I was doing*."

## 2. The prosecutor's disputed comments regarding her credibility and the defense.

During rebuttal argument, the prosecutor complained that defense counsel had "routinely" referred to her as "the Government." The prosecutor reminded the jurors that the court had informed them two weeks before that she was "the People" or "the D.A's office" or she was referred to by name. According to the prosecutor, the defense's reference to her as the government was a "common trick" by the defense to "evoke some emotion in you" about the prosecution.

A short time later during rebuttal, the prosecutor responded to a defense argument that she had failed to call logical civilian witnesses. She assured the jury that, if she had done something improper or wrong, "you would have heard from the judge." Immediately thereafter the prosecutor characterized defense counsel's argument as "another trick. It's dishonest and it's certainly not straightforward."

## B. Standard of review.

The Fourteenth Amendment of the United States Constitution is violated if a prosecutor's misconduct infects a trial with such unfairness that the conviction is a denial of due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009.) In other words, the misconduct must be of sufficient significance as to deny the defendant's right to a fair trial. (*Ibid.*) California law is violated if a prosecutor uses deceptive or reprehensible

12.

methods to attempt to persuade either the court or the jury. (*Id.* at pp. 1009–1010.) However, a defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*Id.* at p. 1010.)

### C. Analysis.

Respondent concedes that, at one particular point during closing argument, the prosecutor misstated the law regarding heat of passion. Respondent, however, argues that reversal is not required due to forfeiture and a lack of prejudice. Respondent contends that no other misconduct occurred.

We agree with respondent and we reject appellant's arguments. We determine that appellant has forfeited each of these claims. In the alternative, we conclude that any misstatement of law was harmless, and no other misconduct occurred. We find any other presumed error to be harmless.

### 1. Appellant's claims are forfeited.

As a rule, a claim of prosecutorial misconduct is forfeited if the defense fails to object and request an admonition to cure any harm. (*People v. Centeno* (2014) 60 Cal.4th 659, 674; *People v. Tully*, *supra*, 54 Cal.4th at p. 1010.) Our Supreme Court makes it clear that a claim of prosecutorial misconduct will not be deemed forfeited "only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 937.) As the high court has stated, "we see no reason to carve out an exception to the general rule that a defendant must object to misconduct at trial to raise the claim on appeal. [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 762 [addressing claim that the prosecutor improperly suggested the responsibility for a death verdict rested elsewhere].)

The parties agree that appellant did not object below to any of the purported prosecutorial misconduct. This record does not support a finding that the defense was

13.

excused from the obligation to raise an objection to preserve this claim for appeal. "The trial atmosphere was not poisonous, defense counsel did not object at all, and the record fails to suggest that any objections would have been futile." (*People v. Riel* (2000) 22 Cal.4th 1153, 1213; accord, *People v. Hill* (1998) 17 Cal.4th 800, 820–821.) Appellant "fails to show how objecting would have been futile under the circumstances of this trial. Consequently, his claims are forfeited." (*People v. Williams* (2013) 56 Cal.4th 630, 672.)

To overcome forfeiture, appellant raises a claim of ineffective assistance of counsel.[17] This is without merit. Our Supreme Court holds that a failure to object to argument seldom establishes counsel's incompetence. (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) Defense counsel "may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments." (*Id.* at p. 773.)

In any event, we determine below that any error was harmless stemming from the prosecutor's various disputed comments. As such, because appellant cannot demonstrate prejudice, any failure by trial counsel to object did not constitute ineffective assistance. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436 [defendant bears burden to establish both deficient performance and resulting prejudice in a claim of ineffective assistance of counsel].) For these reasons, the various claims of prosecutorial misconduct are forfeited.

### 2. Prejudice did not occur from the prosecutor's arguments regarding heat of passion.

Although we accept respondent's concession that the prosecutor made a misstatement of law during closing argument, we also agree that none of the prosecutor's

---

[17] In case No. F081899, appellant has filed a companion petition for writ of habeas corpus. He primarily contends his trial counsel was ineffective in failing to object to the instances of purported misconduct during closing argument. He has filed the writ "to allow for expansion of the record through an evidentiary hearing."

14.

disputed comments regarding heat of passion resulted in prejudice. Heat of passion is not a true defense to murder. Instead, it is the basis for the crime of voluntary manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 199.) "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." (CALCRIM No. 570; see also § 192, subd. (a).)

Three elements are required to establish voluntary manslaughter based on a heat of passion: (1) the defendant was provoked; (2) as a result of the provocation, the defendant "acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;" and (3) the provocation would have caused a person of average disposition to act rashly and without due deliberation; in other words, "from passion rather than from judgment." (CALCRIM No. 570.)

In *People v. Beltran* (2013) 56 Cal.4th 935, our Supreme Court rejected an argument that "provocation must be of a kind that would cause an ordinary person of average disposition *to kill*." (*Id.* at p. 938.) Instead, heat of passion "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Id.* at p. 942.)

In this matter, respondent concedes that, at one point, the prosecutor equated heat of passion as whether provocation would have moved a reasonable person *to kill*. Based on *People v. Beltran*, respondent agrees that the prosecutor misstated the law in this regard. We accept respondent's concession that this was a misstatement of law.

The parties, however, dispute whether or not the prosecutor improperly equated heat of passion with legal insanity. Appellant contends that the prosecutor's comments informed the jury that appellant had to be "legally insane" for voluntary manslaughter to

15.

apply. In contrast, respondent argues that the prosecutor never used the word "insanity" and the jury was not instructed on the legal standard for insanity.

We need not resolve the parties' dispute regarding whether or not the prosecutor equated a heat of passion with legal insanity. We also need not analyze whether or not the prosecutor's other comments represented a misstatement of law. Instead, we determine that any presumed error was harmless.

To establish prejudice, appellant notes that the jury was deadlocked regarding whether he was guilty of second degree murder or manslaughter. He argues the deadlock "must have been over the issue of provocation and heat of passion."[18] He contends that the evidence was "very strong" to establish provocation.[19] Appellant asserts that the jury would not have known to examine the differences between the trial court's instructions and the prosecutor's comments regarding provocation. He contends reversal is required.

We disagree that prejudice occurred. Our Supreme Court has noted that arguments from counsel are generally considered to carry less weight with a jury than instructions from the trial court. (*People v. Centeno*, *supra*, 60 Cal.4th at p. 676.) We are to presume that a jury will treat a prosecutor's comments as words spoken by an advocate in an attempt to persuade while the court's instructions are viewed as binding statements of law. (*Ibid*; accord, *People v. Seaton* (2001) 26 Cal.4th 598, 646.)

In this matter, the trial court instructed the jury to follow its legal instructions to the extent the attorneys' comments were in conflict. The trial court properly instructed

---

[18] The deliberating jury asked the trial court for the definition of "conscious" appearing in CALCRIM No. 520. This is part of the instruction explaining when a defendant has implied malice to commit murder. In relevant part, the jury was instructed that appellant must have "deliberately acted with conscious disregard for human life."

[19] In arguing that the evidence was strong to establish a heat of passion, appellant concedes that the evidence supporting a theory of imperfect self-defense was "very weak." He notes that an eyewitness saw him come out of the store and yell, "come on, mother fucker" before firing.

16.

the jury regarding the elements necessary to find appellant guilty of voluntary manslaughter. Indeed, appellant concedes that the court "correctly described" the type of provocation required to reduce murder to manslaughter pursuant to a heat of passion. The court informed the jurors that voluntary manslaughter was appropriate if (1) appellant was provoked and (2) as a result of the provocation he "acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;" and (3) the provocation "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

We presume that the jury followed the court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Because the jury received proper instructions from the trial court, which we presume were followed, any misstatements of law from the prosecutor were rendered harmless. (See *People v. Pearson* (2013) 56 Cal.4th 393, 440 [finding harmless a prosecutor's misstatement of law because the jury was presumed to have relied on the proper instructions from the court].)

Moreover, any presumed error is harmless because the evidence of appellant's intent to commit murder was overwhelming. The video showed him initiating a fist fight with Jones. After Jones fell against a wall inside the store, appellant reached for a handgun which he had concealed under his shirt. Appellant fired multiple times as Jones took a step towards him. Jones never displayed a weapon and law enforcement never recovered a weapon in the market. The evidence conclusively established appellant's express malice to commit murder.

In addition, although the jury was deadlocked for a time, this record does not reasonably support a finding of voluntary manslaughter based on a heat of passion. "The heat of passion requirement for manslaughter has both an objective and subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The defendant must actually kill in the heat of passion, and the circumstances giving rise to that passion must be such that they would arouse passion in the mind of a reasonable person. (*Ibid.*)

17.

However, the passion aroused cannot be based on revenge. (*People v. Breverman* (1998) 19 Cal.4th 142, 163; *People v. Burnett* (1993) 12 Cal.App.4th 469, 478; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704 ["desire for revenge does not qualify as a passion that will reduce a killing to manslaughter"].)

Here, the circumstances overwhelmingly demonstrate that appellant confronted Jones to either protect his family or to get revenge. The prosecution established that it took appellant about 20 minutes to drive to meet Rosalinda after she called him. On his way to meet Rosalinda, appellant texted that he was going to "beat" Jones. Once appellant arrived, he walked down the street to the store.

During his interview with the detectives, appellant emphasized that he did not confront Jones with an intent to kill. Instead, he only wanted to fight Jones. According to appellant, he brought along the firearm because he did not know Jones and he was concerned that Jones might be armed. Appellant said he shot Jones because he became "scared" after the initial exchange of blows. Appellant thought Jones might have hit him with a bottle. Appellant also stated he thought Jones had been "reaching" for something. Appellant claimed he "blacked out" at that point.

The events surrounding Jones's killing do not reflect the temporal connection between provocation and appellant's act of shooting that commonly negates malice. Instead, there was time for appellant's emotions to cool and it is apparent that he exercised judgment regarding when and how he would confront Jones. Indeed, appellant did not approach Jones with his handgun drawn and appellant did not shoot him right away. The evidence does not reasonably establish that appellant killed Jones under a subjective heat of passion. (See *People v. Steele*, *supra*, 27 Cal.4th at p. 1252 [setting forth requirement for subjective component of heat of passion].) In other words, the record does not reasonably demonstrate that appellant acted without deliberation or judgment, and simply reacted from emotion due to the provocation. (See *People v. Beltran*, *supra*, 56 Cal.4th at p. 950 [setting forth this standard].)

Further, the provocation that occurred in this matter would not have caused a person of average disposition to act rashly and without due deliberation. Rosalinda testified she told appellant that Jones had pinched and grabbed her butt. She also told appellant that Jones had kicked at their youngest daughter. Rosalinda was crying and scared during the phone call. She asked appellant to come over, saying she needed his help. While Rosalinda's phone call would have caused a person of average disposition to become concerned and possibly even angry, such information would not have caused a person of average disposition to act rashly and under the influence of intense emotion that obscured reasoning or judgment. (CALCRIM No. 570.) This record does not support the objective prong necessary to establish a heat of passion.[20]

Finally, the prosecutor's disputed remarks regarding heat of passion were relatively brief and isolated. In comparison, the prosecutor made other arguments that demonstrated a heat of passion was not appropriate. She correctly informed the jury that heat of passion required a defendant to be provoked, and that provocation had to cause a person of average disposition to act "rashly and under the influence of intense emotion that obscured his reasoning or judgment." The prosecutor emphasized that, although appellant had intended to fight Jones, appellant had acted with purpose and deliberation because he had decided to bring a loaded gun with him. She asserted that appellant had time on his drive over to reconsider his actions, but he made decisions along the way that showed his "thought process and deliberation, which means that he wasn't so overcome with emotion."

Based on the entirety of this record, it is not reasonably probable a result more favorable to appellant would have been reached absent the prosecutor's disputed

---

[20] In analyzing the objective prong of heat of passion, it is not appropriate to consider appellant's specific character. (See *People v. Steele*, *supra*, 27 Cal.4th at p. 1253.)

19.

comments regarding heat of passion.[21]  The jury was properly instructed on the law, and the evidence overwhelmingly established murder.  Accordingly, reversal is not warranted for this issue, and this claim fails.

### 3. The prosecutor did not improperly vouch for herself and any presumed error was harmless.

Appellant's second issue arose during rebuttal argument to the jury.  The prosecutor stated that, if she had done anything improper or wrong, "you would have heard from the judge."

According to appellant, the prosecutor improperly vouched for her own credibility and used the trial court "as a silent witness" when doing so.  Appellant also contends that the prosecutor misstated the law regarding the court's function.  To establish error, appellant relies primarily on *United States v. Smith* (9th Cir. 1992) 962 F.2d 923 (*Smith*).  We reject appellant's arguments.

In *Smith*, the prosecutor assured the jury that the prosecution's key witness could not say "whatever he wanted" as defense counsel had suggested because the witness would be prosecuted for perjury if he did so.  (*Smith*, *supra*, 962 F.2d at p. 928.)  The Ninth Circuit held that this remark "constituted the sort of personal and institutional guarantee that the law forbids" because it suggested the prosecutor believed the witness's testimony was true.  (*Id.* at p. 933.)  The prosecutor further "reinforced this message with repeated comments aimed at establishing his own veracity and credibility as a representative of the government," like stating his job was "not to seek a conviction but rather to guarantee a fair trial and turn over any favorable evidence to the defense," and

---

[21]  In his reply brief, appellant contends that this error was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18.  We disagree that prejudice should be reviewed under *Chapman*.  Instead, this alleged misconduct did not deny appellant the right to a fair trial.  Thus, the issue is whether it is reasonably probable appellant would have received a more favorable result without the alleged misconduct. (See *People v. Tully*, *supra*, 54 Cal.4th at pp. 1009–1010.)

that " '[i]f I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen.' " (*Id.* at pp. 933–934.) The Ninth Circuit reversed, concluding that the prosecutor's comments as a whole were not invited and "placed the prestige of the law enforcement branch of government behind his conduct of the trial and behind [the witness]'s testimony." (*Id.* at p. 936.) The Ninth Circuit explained that a defendant's right to receive a fair trial is "severely diminished" if a prosecutor may invoke the court as the guarantor of truthfulness when the veracity of a star witness is challenged. (*Ibid.*)

*Smith* is distinguishable from the present matter. Unlike in *Smith*, the prosecutor here did not make repeated comments aimed at establishing her own veracity and credibility as a representative of the government. (See *Smith*, *supra*, 962 F.2d at pp. 933–934.) Contrary to *Smith*, the prosecutor did not use the prestige of the trial court to bolster a star witness's credibility. (See *id.* at p. 936.) Instead, as appellant notes in his briefing, it appears the prosecutor made this disputed statement in response to a defense argument that she had failed to call logical witnesses. Unlike in *Smith*, appellant's right to receive a fair trial was not severely diminished. The concerns expressed in *Smith* are lacking here, and *Smith* does not mandate reversal.

The prosecutor's isolated statement did not constitute improper vouching and it did not rise to the level of misconduct. Improper vouching by a prosecutor occurs when she either (1) suggests that evidence not available to the jury supports a particular argument, or (2) she invokes her personal prestige or depth of experience, or the prestige or reputation of the office, in support of an argument. (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) The prosecutor's brief comment did not touch on these concerns.

Finally, we agree with respondent that any presumed error was harmless. Nothing reasonably suggests the jurors would have placed any weight on the prosecutor's extremely brief and isolated comment that, if she had done anything wrong, they would have heard from the judge. In any event, the evidence overwhelmingly established appellant's guilt for second degree murder. Consequently, it is not reasonably probable a

21.

result more favorable to appellant would have been reached absent the prosecutor's allegedly improper statement. Therefore, reversal is not warranted for this issue.[22]

### 4. The prosecutor did not disparage defense counsel and any presumed error was harmless.

During rebuttal argument, the prosecutor complained that defense counsel had relied on a "common trick" to invoke an emotional response in the jurors because he had referred to her as "the Government." A short time later during rebuttal, the prosecutor responded to a defense argument that she had failed to call logical civilian witnesses. She assured the jury that, if she had done something improper or wrong, "you would have heard from the judge." Immediately thereafter the prosecutor characterized defense counsel's argument as "another trick. It's dishonest and it's certainly not straightforward."

Appellant argues it was inappropriate for the prosecutor to attack defense counsel. Appellant cites opinions showing that both state and federal appellate courts regularly use the term "the government" to refer to the prosecution. Appellant also contends it was likewise permissible for defense counsel to comment on the prosecution's failure to call logical witnesses. Appellant maintains that the prosecutor committed misconduct. We disagree.

It is improper for prosecutors to launch personal attacks against defense counsel. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.) Misconduct occurs if a prosecutor disparages defense counsel before the jury. (*People v. Williams* (2009) 170 Cal.App.4th 587, 637.) "If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury,

---

[22] Because any presumed error is harmless, we likewise reject appellant's argument that reversal is required because the prosecutor allegedly misstated the law regarding the function of the trial court.

misconduct would be established." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, disapproved on another ground by *People v. Merritt* (2017) 2 Cal.5th 819, 831.) However, "[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings*, *supra*, at p. 1302, fn. 47.)

Here, the prosecutor did not accuse appellant's trial counsel of fabricating a defense or factually deceiving the jury. Our Supreme Court has characterized those particular concerns as the "forbidden tactics" which establish misconduct. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1154, disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Young* (2005) 34 Cal.4th 1149, 1193 [it is misconduct to characterize defense counsel as "liars" or accuse counsel of lying to the jury].) Instead, it appears the prosecutor was attempting to focus the jury away from certain points which the defense had raised.

The prosecutor's comments fall within precedent upheld by our Supreme Court. In *People v. Zambrano*, *supra*, 41 Cal.4th 1082, the prosecutor characterized defense counsel's argument "as a 'lawyer's game' and an attempt to confuse the jury by taking the witness's statement out of context." This did not constitute misconduct. (*Id.* at p. 1154.)

In *People v. Stanley* (2006) 39 Cal.4th 913, it was not misconduct for the prosecutor to tell the jury "that defense counsel 'imagined things that go beyond the evidence' and told them a 'bald-faced lie.' " (*Id.* at p. 952.) The high court held that the prosecutor's remarks were merely responsive to defense counsel's own arguments to the jury on the state of the evidence. (*Ibid.*)

In *People v. Young*, *supra*, 34 Cal.4th 1149, the high court found no misconduct when the prosecutor referred to defense counsel's argument as "idiocy." (*Id.* at p. 1193.) Instead, that it was a "fair comment on counsel's argument." (*Ibid.*)

In *People v. Stitely* (2005) 35 Cal.4th 514, "[t]he prosecutor told jurors to avoid 'fall[ing]' for counsel's argument in favor of a second degree murder verdict, to view counsel's argument as a 'ridiculous' attempt to allow defendant to 'walk' free, to view counsel's statement as an 'outrageous' attempt to demean the victim and treat her as a 'Jane Doe,' and to view counsel's argument as a 'legal smoke screen.' " (*Id.* at p. 559.) Our high court found no misconduct. "The prosecutor simply used colorful language to permissibly criticize counsel's tactical approach. [Citations.] These comments were explicitly aimed at counsel's closing argument and statement, rather than at him personally. We see no improper attack on counsel's integrity." (*Id.* at p. 560.)

In light of Supreme Court precedent, we conclude that the prosecutor's disputed comments here did not amount to misconduct. In any event, we also find any presumed error to be harmless. The disputed remarks were directed against opposing counsel and not against appellant. "The statements came at the conclusion of a lengthy trial in which much evidence was introduced, and there is little likelihood that the jury was affected by the prosecutor's relatively brief remarks." (*People v. Perry* (1972) 7 Cal.3d 756, 790.) It is likely the jurors gave these comments "little or no consideration. Finally, and perhaps most importantly, the judge instructed the jurors that they had to decide the case on the basis of the evidence received in court and that they could not consider statements of counsel as evidence." (*Id.* at p. 791.) For these reasons, we conclude that this alleged prosecutorial misconduct was not likely to have caused a miscarriage of justice, and "reversal of the judgment is not justified on this ground." (*Ibid.*)

Based on this record, we reject appellant's three grounds of prosecutorial misconduct. Appellant has forfeited these various claims due to a failure to object below and seek an admonition. In any event, the prosecutor did not infect the trial with such unfairness as to make the conviction a denial of due process. Each of the disputed comments either did not constitute misconduct or did not cause prejudice. It is not reasonably probable a result more favorable to appellant would have been reached in the

absence of these disputed comments. Accordingly, this claim is without merit and reversal is not required.

## II. The Trial Court Did Not Abuse Its Discretion in Directing the Deadlocked Jury to Resume Deliberations.

The jury twice informed the trial court that it was unable to reach a verdict. Appellant argues that the trial court coercively instructed the jury the second time to continue deliberating.

### A. Background.

From February 4 through February 11, 2019, the jury heard testimony in this matter. On February 13, 2019, the parties gave closing arguments. At 3:30 p.m. that day, the jury began deliberating.

On the morning of February 15, 2019, the jury announced it had unanimously agreed appellant was not guilty of first degree murder. The jury, however, stated it could not reach any further agreement. The court asked for a numerical split. The foreperson responded, "8/4, 9/3." The court noted that the jury had deliberated throughout the day before and it had spent over two hours deliberating that morning before communicating with the court. The court said it wanted the jury to deliberate further and try to reach a unanimous verdict, if it was possible.

The court instructed the jurors with CALCRIM No. 3551.[23] It offered certain suggestions to them, such as not hesitating "to reexamine your own views." The court cautioned the jurors not to change their individual positions just because it differed from another's position, "or just because you or others want to reach a verdict." The jurors were told that both parties were entitled to an individual judgment from each juror.

___

[23] In general, CALCRIM No. 3551 provides instruction to a deadlocked jury regarding continued deliberations. This provides suggestions on how a jury can continue to deliberate.

25.

That same afternoon, the jury formally returned a not guilty verdict for first degree murder. It announced it was still deadlocked regarding second degree murder. The foreperson reported a new "7/5" split. The court polled the individual jurors about whether a unanimous verdict could be reached if the jurors were offered the possibility of further readback or instructional guidance. The court received mixed responses. Five jurors agreed that this could make a difference. However, four jurors said "No" and the remaining three jurors said that this could "possibly" make a difference.

The court directed the jury to return on February 19, 2019, a Tuesday, and resume deliberations. The court noted that Monday was "President's Day." The court told the jurors to "take the weekend to clear your minds" and to come back on Tuesday morning with "a fresh set of eyes and ears" and see if something might assist them in reaching a unanimous verdict. The court stated it and the parties would do their best to provide the jury with anything it needed. "Otherwise, I want you to continue to deliberate and see if there is a dialogue that will allow you to arrive at a unanimous verdict." The court acknowledged the "difficult job" before the jury. The court stated it hoped the "long weekend will give you an opportunity to reassess your positions and your approach and perspective to the job, and we'll see where we stand come Tuesday, okay." The court excused the jury.

On the morning of February 19, 2019, the jury resumed deliberations at about 9:15 a.m. At about 10:55 a.m., it announced it had reached a unanimous guilty verdict of second degree murder. It found true that appellant intentionally discharged a firearm which caused great bodily injury or death to Jones, and that appellant personally used a firearm.[24]

---

[24]    The trial court individually polled the jurors, who each acknowledged that this represented their true and correct verdict.

## B.    *Analysis.*

Appellant argues that, unlike its first instruction to the deadlocked jury, the trial court did not again caution the jurors to not change their positions just because of a difference with another person, or just because someone wanted to reach a verdict. The court also did not instruct the jurors that the parties were entitled to an individual judgment from each of them. According to appellant, the court's second instruction effectively encouraged the jurors "to consider the numerical division or preponderance of opinion" when forming or reexamining their individual views. Appellant maintains that the court's second instruction violated Supreme Court precedent, along with his due process rights. He asserts that the numerical split was growing and not lessening before the court's second instruction. Appellant argues it is reasonably probable he would have obtained a more favorable result had the court not so acted. He relies primarily on *Jiminez v. Myers* (9th Cir. 1994) 40 F.3d 976 (*Jiminez*).

Appellant's arguments and his cited authority are unpersuasive. We agree with respondent that appellant has forfeited this claim. In any event, it also fails on its merits.

### 1.    This claim is forfeited.

It is undisputed that appellant did not object when the trial court instructed the jury the second time to continue its deliberations. Appellant argues he did not have a reasonable opportunity to raise an objection because the trial court did not review its instruction with the parties before directing the jury to come back after the long weekend and continue deliberating. In the alternative, appellant contends that the court had an obligation to instruct the jury correctly. Finally, appellant raises ineffective assistance of counsel if this claim is deemed forfeited.

Respondent disagrees with appellant's characterization that the trial court's final statement to the jury amounted to a formal "instruction." However, respondent raises forfeiture if that final statement is deemed an instruction.

27.

We need to resolve the parties' dispute regarding whether or not the trial court gave a formal "instruction" to the jury when it directed them to resume deliberating after the holiday break. Regardless of how the court's statement is classified, appellant was obligated to preserve for appeal this assignment of alleged error. His failure to object below precludes his obtaining appellate relief to the extent he claims the trial court committed statutory error. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [failure to object precludes appellate relief regarding alleged statutory error committed by trial court].)

As we explain below, the trial court did not improperly coerce the jury. Thus, appellant's due process rights were not violated and appellant does not demonstrate ineffective assistance of counsel. Defense counsel was not obligated to lodge an objection that counsel reasonably determined would be futile. (*People v. Price* (1991) 1 Cal.4th 324, 387.) Consequently, this claim is deemed forfeited.

### 2. This claim fails on its merits.

In relevant part, section 1140 provides that a jury cannot be discharged without having rendered a verdict unless the trial court deems there is no reasonable probability that the jury can agree. " 'The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion.' " (*People v. Lopez* (2018) 5 Cal.5th 339, 364.)

A trial court must exercise its power under section 1140 without coercing the jury. (*People v. Lopez, supra*, 5 Cal.5th at p. 364.) A jury's independent judgment must not be displaced in favor of compromise and expediency. (*Ibid.*) Our high court has explained that " ' "[a]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." ' [Citation.]" (*Ibid.*)

In *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), disapproved on another ground in *People v. Valdez* (2012) 55 Cal.4th 82, 163, our Supreme Court held it is

28.

improper for a trial court to "appeal to dissenting jurors to abandon their own independent judgment of the case against the accused." (*Gainer*, at p. 849.) *Gainer* established prohibitions for a trial court when dealing with a deadlocked jury. Error occurs if a trial court encourages deadlocked jurors to consider the "numerical division or preponderance of opinion of the jury" when renewing deliberations. (*Id.* at p. 852.) It is also error if a trial court states or implies that the case will necessarily be retried if the jury fails to agree. (*Ibid.*)

Two Supreme Court opinions, *People v. Tarantino* (1955) 45 Cal.2d 590 (*Tarantino*) and *People v. Pride* (1992) 3 Cal.4th 195 (*Pride*) are instructive in this matter. Both *Tarantino* and *Pride* demonstrate that the trial court did not abuse its discretion in directing the jury to continue its deliberations. Before summarizing those opinions, we review appellant's cited authority, *Jiminez*.

### a. Jiminez.

In *Jiminez*, the Ninth Circuit concluded that the defendant had been denied a fair trial and his federal constitutional due process rights violated because the California state trial court had coercively directed the jury to continue deliberating. (*Jiminez*, *supra*, 40 F.3d at p. 981.) The jury twice declared it was deadlocked. Both times, the trial court inquired about the numerical split. (*Id.* at pp. 978–979.) The final split was "[e]leven-one." (*Id.* at p. 979.) The trial court stated that "substantial movement" had occurred "since the last time." The court ordered the jury to finish deliberations that day "and see where we are at that point in time." (*Id.* at p. 979.) Defense counsel objected and asked the court to inquire whether further deliberation would be fruitful. The defense also argued that "a tremendous amount of pressure" was being exerted on the lone holdout juror. (*Ibid.*) The court determined that the holdout juror would not be subjected to " 'undue pressure' " because the jury had only been asked to finish the day deliberating,

which was about two more hours.  (*Ibid.*)  The jury returned a guilty verdict after an hour and 48 minutes of additional deliberation.

The Ninth Circuit held that "the trial court's comments and conduct amounted to giving the jury a de facto *Allen* charge, which instructs the jurors to work towards unanimity and the minority to reexamine its views."[25]  (*Jiminez*, *supra*, 40 F.3d at p. 980.)  The trial court had "effectively instructed the jurors to make every effort to reach a unanimous verdict."  (*Id.* at p. 981.)  The trial court had elicited the progression in the voting and determined it was moving in one direction.  The trial judge had expressed "his approval of that progression," and told the jury to continue its deliberations.  (*Ibid.*)  "In view of the disclosure after the second impasse that only one juror remained in the minority and the trial court's implicit approval of the 'movement' toward unanimity, the court's instruction to continue deliberating until the end of the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity."  (*Ibid.*)  "The trial court's failure to counter-balance the implication of its questions and comments by instructing the hold-out juror not to surrender his or her sincere convictions strongly supports the conclusion that the jury was impermissibly coerced to render a unanimous verdict."  (*Ibid.*)

### b.    *Tarantino.*

In *Tarantino*, the defendant was indicted on one count of conspiracy to commit extortion and three counts of extortion.  (*Tarantino*, *supra*, 45 Cal.2d 590 at p. 592.)  The

---

[25]    See *Allen v. United States* (1896) 164 U.S. 492, 501.  Courts have not settled upon a " 'precise formulation' " for an *Allen* charge.  (*United States v. Washington* (9th Cir. 2011) 444 F.App'x 943, 948.)  The "defining feature of an *Allen* charge is the request that jurors, particularly minority jurors, re-examine their views of the evidence."  (*Ibid.*)  In 1977, our Supreme Court held that an *Allen* charge was prohibited in California because "it instructs the jury to consider extraneous and improper factors, inaccurately states the law, carries a potentially coercive impact, and burdens rather than facilitates the administration of justice."  (*Gainer*, *supra*, 19 Cal.3d at pp. 842–843.)

jury deliberated from the morning of December 18 through the evening of December 22 before rendering guilty verdicts on all four counts. (*Id.* at p. 599.) During that span, the jury alerted the trial court at least twice that it could not reach agreements. On December 21, and again on the late afternoon of December 22, the trial court instructed the jury to continue its deliberations. During its final discussion with the jury, which occurred at 4:30 p.m., the court stated it was the jurors' " 'duty' " to deliberate and it would violate their oaths as jurors to refuse to discuss the case further. (*Id.* at p. 600.) The court said it knew the jurors " 'have been very patient and have been here a long time, and maybe tempers wear thin, but it is your duty to deliberate until the court excuses you.' The judge pointed out that the jury need not be in agreement as to all counts and asked them to deliberate 'somewhat further.' At 8:45 p.m. they returned with the verdicts." (*Ibid.*)

The Supreme Court in *Tarantino* rejected the defendant's assertion that the trial court had coerced the verdicts. According to the high court, the trial court never suggested what verdicts should be reached and it did not impose any improper pressure upon the jury to agree. (*Tarantino*, *supra*, 45 Cal.2d at p. 600.) The trial court did not require the jury "to prolong their deliberations unduly, particularly in view of the fact that the trial had consumed 44 days." (*Ibid.*) The Supreme Court found no judicial coercion. (*Ibid.*)

### c. Pride.

In *Pride*, the defendant was sentenced to death following convictions for two murders. (*Pride*, *supra*, 3 Cal.4th at p. 213.) During the penalty phase, the jury deliberated for more than an entire week, and its vote apparently remained at 11 to 1 for most of that time. (*Id.* at p. 265.) The foreperson "publicly suggested the minority juror was breaching his or her duty to impose the appropriate penalty." (*Ibid.*) On appeal, the defendant argued that the trial court had coerced the verdict by ordering deliberations to

31.

continue. (*Ibid.*)  According to the defendant, the trial court had impliedly agreed with the foreperson's assessment.  Our Supreme Court rejected these arguments.  (*Ibid*.)

Citing section 1140 and various Supreme Court precedents, *Pride* held that a trial court "may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (*Pride*, *supra*, 3 Cal.4th at p. 265.)  The trial court had "avoided any comment on the status of the vote and strongly suggested it was irrelevant.  The jury was never told it must reach a verdict, nor were any other constraints placed on their deliberations." (*Id.* at pp. 265–266.)  The high court found it persuasive that, a few days earlier, the trial court had reread the instruction describing the individual nature of the penalty determination.  In addition, the trial had been lengthy and complex.  As such, "the direction to continue deliberations could only have been perceived as giving jurors an opportunity to enhance their understanding of the case, rather than as pressure to reach a verdict." (*Id.* at p. 266.)  Finally, two jurors had told the trial court that they believed a verdict might be reached, and no juror said a unanimous agreement was impossible.  The Supreme Court concluded that the trial court had not coerced a verdict or abused its discretion under section 1140. (*Pride*, at p. 266.)

### d. *The present matter.*

In this matter, the trial court asked the jurors to "take the weekend to clear your minds" and to come back on Tuesday morning with "a fresh set of eyes and ears" and see if something might assist them in reaching a unanimous verdict.  The court stated that the jury would be provided with anything it needed.  "Otherwise, I want you to continue to deliberate and see if there is a dialogue that will allow you to arrive at a unanimous verdict."  The court's comments comply with California Rules of Court, rule 2.1036, which permits a trial court to remind a jury at an impasse "of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with

32.

each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict."

We conclude that the trial court did not abuse its discretion. The court never stated or implied that this case would be retried if the jury failed to reach an agreement. The court never suggested to the jurors that they should reconsider their views in light of the numerical breakdown of the votes. Thus, the trial court did not violate the prohibitions announced in *Gainer*. (See *Gainer*, *supra*, 19 Cal.3d at p. 852.)

When the first deadlock was discussed, the trial court cautioned the foreperson to provide only the numerical breakdown and not to disclose how the jurors were split. "This directive communicated to the jury that the court was not concerned with the direction of the voting." (*People v. Brooks* (2017) 3 Cal.5th 1, 90.) Although the trial court instructed the jurors to continue deliberating a second time, the court did so only after polling the individual jurors and receiving some positive feedback that further deliberations could be fruitful. Our Supreme Court has approved of this approach. (See *People v. Lopez*, *supra*, 5 Cal.5th at p. 364 [noting with approval that the trial court questioned "individual jurors on whether he or she believed the jury was deadlocked and whether the court could do anything to assist the process"].) Indeed, *Pride* held that a trial court "may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (*Pride*, *supra*, 3 Cal.4th at p. 265.)

Unlike in *Jiminez*, the trial court did not express any approval regarding how the numerical split was progressing. The court also did not impliedly direct the jurors to abandon their respective positions just to reach unanimity. Instead, the court asked the jurors to "see if there is a dialogue that will allow you to arrive at a unanimous verdict." The court acknowledged the "difficult job" before the jury, and it hoped the long weekend would give the jurors an opportunity "to reassess your positions and your approach and perspective to the job." *Jiminez* is distinguishable and it does not dictate reversal.

Finally, the trial court never suggested what verdict the jurors should reach. As in *Tarantino*, the court did not require the jury to unduly prolong its deliberations, and the court did not impose improper pressure on the jury to reach an agreement. Similar to *Pride*, the court never told the jury it must reach a verdict, and it did not place any constraints on their deliberations. Instead, the court invited the jury to seek additional resources if needed and "we'll see where we stand come Tuesday, okay." Both *Tarantino* and *Pride* support affirming the trial court's decision. Judicial coercion did not occur.

## III. Appellant's Claim of Ineffective Assistance of Counsel Is Without Merit.

Appellant raises a claim of ineffective assistance of counsel. He argues that his counsel failed to object during the prosecutor's closing arguments, and his counsel failed to object to the trial court's instruction that directed the jury to continue deliberations a second time. According to appellant, his counsel also misstated the law regarding heat of passion during the defense's closing argument.

Accompanying this appeal, appellant has filed a petition for writ of habeas corpus.[26] In the petition, he contends his trial counsel was ineffective in failing to object to the instances of purported misconduct during closing argument, and in failing to object to the court's instruction directing the jury to continue deliberations a second time. He also argues that his trial counsel failed to ask for the media to be excluded when the jury

---

[26] On January 21, 2021, this court issued an order deferring a ruling on the petition for a writ of habeas corpus pending a ruling in the present appeal.

was told to continue its deliberations.[27]  According to appellant, he filed the petition "to allow for expansion of the record through an evidentiary hearing."[28]

We reject appellant's claim of ineffective assistance of counsel.  We likewise summarily deny the companion petition for a writ of habeas corpus.

Under the federal and state Constitutions, a criminal defendant is entitled to the effective assistance of counsel.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  To prevail on a claim of ineffective assistance of counsel on direct appeal, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)  The defendant has the burden of showing both deficient performance and resulting prejudice.  (*People v. Lucas*, *supra*, 12 Cal.4th at p. 436.)  In conducting this review, the appellate court considers whether the record contains any explanation for counsel's actions; if the record sheds no light on counsel's actions, the claim is not cognizable unless counsel was asked for an explanation and failed to provide one, or unless there could be no satisfactory explanation for the actions taken.  (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

---

**27**  On the morning of February 15, 2019, the trial court put on the record that "a representative of the media" was present.  However, the record does not reflect whether or not any member of the media was present during the afternoon session when the court instructed the jury to continue deliberations after the holiday weekend.

**28**  Appellant filed no declarations or other supporting documents in support of his petition for a writ of habeas corpus.  To satisfy the initial burden of pleading adequate grounds for relief, such a petition should "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts *and affidavits or declarations*.  [Citations.]  'Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing.'  [Citation.]  We presume the regularity of proceedings that resulted in a final judgment [citation], and, as stated above, the burden is on the petitioner to establish grounds for his release.  [Citations.]"  (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [italics added].)

Likewise, a habeas corpus petitioner must prove facts by a preponderance of the evidence that establish a basis for relief. A petitioner must establish either (1) that, because of defense counsel's performance, "the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations]; or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations.]" (*In re Visciotti* (1996) 14 Cal.4th 325, 351–352.)

In the present matter, we have already explained that the prosecutor either did not commit misconduct during closing arguments and/or any misstatement of law was harmless. We have also already concluded that the trial court did not coercively direct the jury to continue deliberations after it announced it was deadlocked. As such, appellant does not demonstrate ineffective assistance of counsel. Appellant fails to show that his counsel's failure to raise objections to these disputed points fell below an objective standard of reasonable competence. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price*, *supra*, 1 Cal.4th at p. 387.) "Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments." (*People v. Ghent*, *supra*, 43 Cal.3d at p. 773.)

Moreover, appellant has not established that he was prejudiced. As we have already explained, it is not reasonably probable a more favorable result would have occurred had the prosecutor not made her disputed comments. Thus, appellant does not

meet his burden of establishing any resulting harm even if his counsel should have raised objections.**29**

Finally, we reject appellant's assertion that his trial counsel prejudicially misstated the law regarding heat of passion. During closing argument, defense counsel asserted that "someone from a very wealthy neighborhood" might not believe it was reasonable to shoot Jones. However, counsel argued that the jurors had to "look at the situation" and counsel began to suggest that it was appropriate to consider how a person from this particular neighborhood would have acted. The prosecutor objected, contending that defense counsel's argument misstated the law. The trial court overruled that objection, and it admonished the jury that it was to rely on the legal instructions provided by the court. Based on the admonishment given to the jury, along with the proper legal instructions regarding heat of passion, any potential misstatement of law by defense counsel was harmless.

Based on this record, appellant does not demonstrate ineffective assistance of counsel. We will summarily deny the companion petition for a writ of habeas corpus because appellant does not prove facts by a preponderance of the evidence that establishes a basis for relief. This claim on direct appeal is likewise without merit.

## IV. The Sentence is Conditionally Reversed for the Trial Court to Exercise its new Discretion Following *Tirado*.

At sentencing in this matter, the trial court declined to strike the firearm enhancements which the jury found true under sections 12022.5 and 12022.53. The court stated that appellant's use of a firearm was an "integral part" of his conduct in this matter. The court determined it was appropriate to impose the greater enhancement of 25 years to life under section 12022.53, subdivision (d). The court also imposed but stayed the upper

---

**29**     Likewise, no prejudice is demonstrated based on defense counsel's alleged failure to exclude media from the courtroom when the trial court directed the jury to continue deliberations after the holiday weekend.

term of 10 years on the firearm enhancement found true under section 12022.5, subdivision (a). Appellant received a prison sentence of 15 years to life for the second degree murder, along with a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

After sentencing in this matter, our high court held in *Tirado* that, in certain circumstances, a sentencing court may strike a firearm enhancement under section 12022.53, subdivision (d), and, instead, impose a lesser uncharged statutory enhancement. (*Tirado*, *supra*, 12 Cal.5th at p. 692.) According to the Supreme Court, "[T]he Legislature has permitted courts to impose the penalties under section 12022.53[, subdivision] (b), (c), or (d) so long as the existence of facts required by the relevant subdivision has been alleged and found true." (*Tirado*, at p. 702.)

The parties agree that appellant was sentenced before our Supreme Court issued *Tirado*. Via supplemental briefing, the parties dispute whether or not this matter should be remanded in light of *Tirado*. Respondent principally asserts that, based on the prior sentencing choices, a remand is unnecessary because there is no reasonable likelihood of a different result.

We conclude that a remand is appropriate to protect appellant's due process rights. At the time of appellant's sentencing, the court only had a binary choice regarding the firearm enhancement found true under section 12022.53, subdivision (d); either impose a sentence of 25 years to life or impose no time. *Tirado* makes it clear that sentencing courts now have discretion to impose an alternative penalty under section 12022.53, subdivision (b), (c), or (d) "so long as the existence of facts required by the relevant subdivision has been alleged and found true." (*Tirado*, *supra*, 12 Cal.5th at p. 702.) In the interests of justice, it is appropriate for the trial court to exercise this discretion, and we will accordingly remand this matter. (See § 1260 [an appellate court may remand a cause to the trial court for such further proceedings as may be just under the

circumstances].)  We take no position on how the court should exercise its sentencing discretion.

## DISPOSITION

Appellant's sentence is conditionally reversed.  This matter is remanded to the trial court with directions for it to exercise its discretion to impose the term of 25 years to life for using a firearm (§ 12022.53, subd. (d)) or, instead, to impose an enhancement under section 12022.53, subdivision (b) or (c) "so long as the existence of facts required by the relevant subdivision has been alleged and found true."  (*Tirado*, *supra*, 12 Cal.5th at p. 702.)  Should the court decline to strike or modify the enhancement under section 12022.53, subdivision (d), then appellant's sentence shall be reinstated and stand affirmed.  Should the court order the firearm enhancement stricken and/or modified, the court shall resentence appellant accordingly and forward a new abstract of judgment to the appropriate authorities.  In all other respects, the judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.